IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                                    PLAINTIFF

v.                              No. 5:12-cv-50035-002

K. VAUGHN KNIGHT                                            DEFENDANT

## OPINION AND ORDER

Currently before the Court are Defendant K. Vaughn Knight's motion (Doc. 184) for

acquittal or for a new trial and brief in support (Doc. 185), the Government's response in opposition

(Doc. 191), and Knight's reply (Doc. 193). On November 18, 2013, a jury found Knight guilty of

all eight counts charged in the fourth superseding indictment (Doc. 157). The Court extended the

time for Knight to file post-trial motions until December 7, 2013. The motion for acquittal and/or

motion for new trial was timely filed. Having considered the motion, and having conducted an

exhaustive review of the record in this case, the Court finds that Defendant's motion should be

GRANTED IN PART and DENIED IN PART. The Court finds that the motion for judgment of

acquittal should be granted as to Count 3 of the fourth superseding indictment and denied as to the

remaining counts. The Court further finds that the motion for new trial should be granted as to all

remaining counts: 1, 2, and 4-8.

## I.      Procedural History

Knight was originally charged in this case on January 16, 2013 along with two co-defendants,

Brandon Lynn Barber and James Van Doren. Both Barber and Van Doren entered pleas of guilty

prior to the scheduled trial date. On October 30, 2013, Knight was indicted in a fourth superseding

indictment with one count of conspiracy to commit bankruptcy fraud in violation of 18 U.S.C. §§

-1-

157 and 371 (Count 1), one count of bankruptcy fraud—concealment of assets and aiding and abetting in violation of 18 U.S.C. §§ 152(7) and 2 (Count 2), one count of aiding and abetting the making of false statements in relation to a bankruptcy proceeding in violation of 18 U.S.C. §§ 152(3) and 2 (Count 3), and five counts of money laundering and aiding and abetting in violation of 18 U.S.C. §§ 1957 and 2 (Counts 4-8).[1]

Knight is a licensed attorney, and the charges against him stem from actions taken by Knight in connection with his representation of a client, Barber, over a period of time from early 2008 through 2010. The case involves consideration of numerous complex monetary transactions, including real estate deals, money transfers, and, in large part, the allegedly improper use of Knight's interest on lawyer's trust account ("trust account"[2]) to hide money from Barber's creditors. The case also involves consideration of complicated bankruptcy issues, including what information must be reported—and by whom—to the bankruptcy court when an individual files for Chapter 7 bankruptcy. Although the Government's closing request was for the jury to rely on its common sense in deciding this case, there was not much about this case that lent itself to a common-sense analysis. This was one of the most technical and complex cases the Court has tried.

On November 18, 2013, after a nine-day trial, the jury returned a verdict of guilty as to all eight counts. Knight now argues that the Government presented no evidence that Knight acted in contemplation of Barber filing for bankruptcy, and therefore the Court should enter a judgment of acquittal as to the conspiracy, bankruptcy fraud, and money laundering counts. Knight also argues

---

[1] All references to specific counts and to the indictment itself are to the fourth superseding indictment.

[2] Throughout this opinion, when the Court refers to Knight's trust account, the Court is referring specifically to the account containing funds of Barber and/or his entities.

that the Government presented no evidence at trial that Knight aided and abetted Barber in making false statements, made a statement to the bankruptcy court, or had any intent to defraud, and therefore the Court should enter a judgment of acquittal as to the false statements count.  In the alternative, Knight argues that the Court should grant a new trial as to all counts as the evidence preponderates heavily against the guilty verdict as to each count such that a serious miscarriage of justice will occur if a new trial is not granted.

## II.    Preliminary Discussion of Evidence and Testimony

The Court has conducted a thorough and exhaustive review of both the documentary evidence admitted and the testimony[3] presented at trial.  For purposes of the motion for judgment of acquittal, the Court viewed the evidence in a light most favorable to the jury's verdict.  However, for purposes of the motion for new trial, the Court engaged in an overall review of the evidence to determine whether the verdicts as to each count were contrary to the weight of the evidence presented at trial.  This preliminary discussion is largely a recitation of facts that are not disputed by the parties unless otherwise noted.  Although these facts were presented at trial through either documentary evidence or testimony, the ultimate relevance of particular facts to the charges against Knight will be discussed and analyzed in the analysis section of this opinion, Section III, below.

Brandon Barber was a real estate developer in Northwest Arkansas from 2003 until around the time of the filing of his personal bankruptcy petition in July 2009.  One of Barber's most high-profile projects was the "Legacy building," a high-rise condominium building on Dickson Street in

---

[3] Neither party ordered a certified transcript of the proceedings.  In conducting its review, the Court reviewed the realtime transcript prepared by the court reporter.  Where there was any doubt or concern as to the reliability of the realtime transcript, based on the Court's notes or recollection of the testimony, or any portions of the realtime transcript that were incomprehensible, the Court had the court reporter independently verify the pertinent testimony.

Fayetteville, Arkansas. The Legacy project was financed with a construction loan in the amount of $16,700,000 by Legacy National Bank of Springdale, Arkansas ("Legacy Bank"). (Def. Ex. 11).[4] The loan was made in late 2005 for the benefit of one of Barber's limited liability companies, Lynnkohn, LLC ("Lynnkohn"), with Barber, Seth Kaffka (Barber's brother-in-law at the time), and their wives all serving as personal guarantors.[5] *Id.* Barber began to have financial troubles in 2007 when a supplier of materials on the project was not paid and the supplier filed suit in state court to foreclose a materialman's lien. Legacy Bank, a party to the action, filed a foreclosure cross-claim against Barber that ultimately resulted in the bank taking over the Legacy building property and obtaining a consent judgment of foreclosure against Lynnkohn, Brandon and Keri Barber, and Seth and Laura Kaffka. Legacy Bank later obtained a deficiency judgment after the foreclosure sale of the Legacy building. The deficiency judgment was entered on November 26, 2008, in the amount of $8,400,000.

In January of 2008, Vaughn Knight, having heard about the foreclosure action on the Legacy building and Barber's various legal and financial troubles, communicated with Barber by email. In the email, Knight thanked Barber for some tickets to a Dallas Cowboys game and said that he might be able to offer Barber some "limited" legal advice to return the favor. (Gov't Ex. 60). Knight told Barber in the email that he had "quite a bit of experience in the areas of concern." *Id.* In reply, Barber welcomed the offer, stating "Vaughn, your email might be an angel to me. I definitely need

---

[4] Where possible throughout this recitation of facts, the Court cites to a specific trial exhibit in support of a factual statement. Where no exhibit is cited, the Court relied on testimonial evidence in support of the fact or facts stated.

[5] At the time the loan was made, Seth Kaffka also owned a twenty percent share of Lynnkohn.

-4-

advice . . . ." *Id*.  Knight began his representation of Barber shortly thereafter and continued the representation through at least the initial stages of Barber's personal bankruptcy proceedings in the latter half of 2009.  Knight also represented Barber on a pro bono basis during some portion of the bankruptcy proceedings in 2010.  When the representation first started, Knight charged Barber an hourly fee of $200.  (Def. Ex. 176).  From January 12, 2008 to February 29, 2008, Knight billed Barber for 191 hours, resulting in fees of $37,400.  *Id*.  Thereafter, Knight charged Barber at a monthly rate of $17,000.  Barber was then billed separately for the Knight Law Firm's representation of Barber in his filing for personal bankruptcy.  (Gov't Ex. 76; Def. Ex. 148).

One of the first major legal issues to be addressed at the time Knight began representing Barber was the Legacy Bank foreclosure action.  In late February 2008, Knight met with Barber, Seth Kaffka, and a few Barber Group[6] employees to discuss the foreclosure action.  On February 28, 2008, Knight drafted an email to Marshall Ney, counsel for Legacy Bank, and emailed it to Barber for review.  (Gov't Ex. 64).  In the draft, Knight appears to use the possibility of Barber having to file for personal bankruptcy as a bargaining chip in negotiating the Legacy Bank debt with Ney.  In making an offer to settle the Legacy Bank debt, Knight proposed telling Ney that "a deficiency judgment of $1 million is no different that [sic] $10 million.  The guarantors can't pay either one and they are forced to file bankruptcy."  *Id*.

In March of 2008, around the same time that Knight was working on the Legacy Bank foreclosure action, Barber was putting together two real estate deals that he hoped would net him some cash.  One deal that Barber and Knight worked on with another attorney retained by Barber,

---

[6] Barber Group was the business entity used by Barber for most of 2008 in running the day-to-day operations of his real estate development business.

Ken Hall—using a new Barber entity called Delta Land Holdings, LLC—apparently never came to fruition. (*See* Gov't Exs. 9, 20). The second deal that Barber was working on eventually closed on March 31, 2008. This deal was referred to by the parties at trial as the "Ballpark" or "Outfield transaction." For the sake of consistency, the Court will refer to the transaction throughout this opinion as the "Ballpark transaction." As the real estate transactions discussed in this case are complex, the Court will address each of them separately at the appropriate time in this chronological recitation of facts.

### A.    Ballpark Transaction

The land involved in the Ballpark transaction was a forty-acre tract of property located near the ARVEST baseball stadium in Springdale, Arkansas. Darin and Christine Riggins had the property listed for sale through a revocable trust. Although Knight had drafted an agreement for a sale of the property directly from the Rigginses to Epsilon Investments, LLC ("Epsilon")[7] (Gov't Ex. 10), that deal did not materialize. Prior to the Ballpark transaction taking place, John David Lindsey—through his entity JDL Development, LLC—purchased the property from the Rigginses. After Lindsey acquired the property from the Rigginses, Barber arranged a transaction whereby he used a newly created entity, EIA International, LLC ("EIA"),[8] as the middle man, and received $1,200,000 in a "land flip" transaction. EIA bought the property from Lindsey's entity for $2,000,000. (Gov't Ex. 4a). On the same day, Outfield Development, LLC, owned by a man named

---

[7] Epsilon was a business entity formed and owned by James Van Doren and Ian Sadler. Van Doren was an investment banker in New York who was a childhood friend of Brandon Barber. Van Doren was a co-defendant in this case who pleaded guilty to one count of money laundering on August 23, 2013.

[8] EIA was formed by Ken Hall on March 6, 2008. (Gov't Ex. 27).

Bob Gaddy, bought the property from EIA for $3,200,000. (Gov't Ex. 4b). The transaction was funded by a $3,200,000 loan from First Federal Bank ("First Federal") to Outfield Development, LLC. (Def. Ex. 132). While Knight had originally prepared a contract for a sale between the Rigginses and Epsilon, Ken Hall took the lead in negotiating and preparing the documents used in the Ballpark transaction as it ultimately came to be.[9]

Hall testified that he suggested to Barber that Barber needed a loss to offset any gain he might show on the Ballpark transaction. Barber supposedly had an existing liability to Epsilon. This vague antecedent agreement was memorialized in a contract dated March 21, 2008, drawn up by Hall as part of the Ballpark transaction, in which Barber Development, Inc. ("Barber Development") agreed to be contractually responsible to satisfy losses and ongoing indebtedness obligations and expenses of Epsilon resulting from Epsilon's purchase and ownership of property in another real estate development project known as "Timber Trails." (Gov't Ex. 14; Def. Ex. 184). Barber, through Barber Development, had previously sold four lots in the "Timber Trails" development to Epsilon. In order to buy the Timber Trails houses, Epsilon had obtained a line of credit for $600,000, and Barber Group was to build and sell the homes for Epsilon. By the time of the Ballpark transaction, Barber had exhausted Epsilon's line of credit, and the Timber Trails houses were unfinished and encumbered by liens. Epsilon had at that point incurred losses of $65,000 on the Timber Trails deal from discharging liens and paying interest on the line of credit.

---

[9] For example, the warranty deed was prepared by Hall (Gov't Ex. 98); Hall primarily communicated with the parties in structuring the transaction (*see* Def. Ex. 16), with Knight being copied on only some emails; Hall was originally supposed to close the deal; Hall suggested the bank did not need to know any escrowed funds might go back to EIA and that "hopefully we can just show a pay-off to Epsilon," *id.*; and Hall and Barber communicated with Donna Stewart from the title company to get documents, including the HUD statement, ready for closing (Def. Exs. 129-130).

Another property owned by Brandon Barber and/or his wife (now ex-wife), Keri Barber,[10] was also in foreclosure. This property was referred to by the parties as the "Sloan Estates property," and the Court will refer to it as "Sloan Estates." As a part of the larger Ballpark deal, Epsilon agreed to buy Sloan Estates and assume a $514,000 mortgage held by First Federal Bank. Van Doren testified that Barber told Van Doren that his purchase of Sloan Estates was needed to induce First Federal to finance the Ballpark transaction for Bob Gaddy. Barber agreed to pay Epsilon a $25,000 incentive fee for purchasing Sloan Estates.

The Ballpark transaction closed on Monday, March 31, 2008. Although Hall was originally supposed to handle the closing, he backed out the day before the transaction closed, saying that it was because he could not provide a closing protection letter. (Gov't Ex. 29). Donna Stewart from the title company was to handle the closing instead. Ken Hall testified that the closing letter was just an excuse he came up with to distance himself from the deal after he began to have some misgivings about it. There are, however, emails to and from Hall regarding the deal dated the morning of the closing and after the closing. (*See* Def. Exs. 54, 128). Hall testified that he never communicated any of his vague concerns to Knight. After the transaction was funded by First Federal—on April 2, 2008—the proceeds resulting from the land flip were disbursed to the Knight Law Firm ($688,937), Bob Gaddy ($435,371), and EIA ($77,841). (Gov't Ex. 4b).

The approximately $688,000 to the Knight Law Firm was placed in the firm's trust account to be escrowed for EIA and Epsilon with Knight acting as the authorized escrow agent. Barber and Van Doren had signed an escrow agreement on behalf of their respective entities. (Gov't Ex. 12).

_____

[10] The record seems to reflect that the property was actually in Keri Barber's name, but the parties refer to the debt on the property as Brandon Barber's debt. In at least one email, Hall refers to the seller of the property as "KCB Investments, LLC." (Def. Ex. 16).

Both the escrow agreement and the related settlement agreement were drafted by Ken Hall.  On the night before closing, Knight made largely non-substantive changes to the escrow agreement at Van Doren's request.[11]  It was Barber and Hall who suggested using Knight as the escrow agent just days before the closing took place.  (Def. Ex. 133).  Van Doren testified that the escrow agreement was Barber and Hall's idea after Hall raised the issue of Barber needing to note a loss to offset any gain on the Ballpark transaction.

Under the escrow agreement, Barber and Van Doren agreed to escrow $688,000 from the proceeds of the Ballpark transaction to be used to cover Epsilon's losses on the Timber Trails property and to protect against future losses on the four unsold Timber Trails lots.[12]  (Gov't Ex. 12).  After the closing, as had been contemplated by the parties to the escrow agreement, Knight transferred $90,664 to Epsilon on the same day he received the disbursed funds (April 2, 2008), representing approximately $65,000 in losses on Timber Trails that had already accrued and $25,000 for the "incentive fee" for Epsilon taking over the Sloan Estates mortgage.  (Gov't Exs. 15-16).  Also on April 2, as contemplated by Barber and Van Doren, Knight transferred $32,000 of the escrowed funds to Van Doren personally to repay personal loans that Van Doren had made to Barber.  *Id*.  On the same day, the parties tentatively agreed to using another $100,000 of the escrowed funds to pay off a Barber debt to Enterprise Bank (Def. Ex. 29), but that transfer was ultimately not made.

---

[11] Hall offered, in an email to Van Doren, to make the same changes on the morning of the day the deal was closed.  (Def. Ex. 128).

[12] A second escrow agreement between Barber and Van Doren provided that $15,000 from the first escrow agreement (to be deposited into the escrow account by EIA) would be escrowed to cover principal and interest obligations on the Timber Trails lots as those obligations came due. (Gov't Ex. 13).

Knight held the remaining funds in escrow in his trust account and later released them to Barber at various points in time.  Van Doren testified, and certain emails in evidence appear to bear out, that the escrowed funds were to be released to EIA (Barber) in installments as each Timber Trails house was sold.  It was at least Van Doren's understanding, as he explained to Ken Hall, that "for example, when Lot 108 is sold . . . we release $154,000 for that loan balance since the loan will be paid off by the proceeds from the buyer.  This is the way we ensure that we get our deal: that the houses are sold and we no longer have those loans." (Def. Ex. 128).  The escrow agreement itself is not clear as to this installment plan.  Rather, the escrow agreement contemplated that funds would be released as any debts, costs, and expenses—other than debts, costs, and expenses related to the principal debt on the real property—were paid and after Epsilon had been reimbursed for any expenses previously paid by Epsilon.  (Gov't Ex. 12).  This language is in line with Hall's understanding, as he explained to Van Doren, that money could be released to EIA "upon paying all liens and other claims related to the Timber Trails houses, reimbursing all out of pocket expenses to [Van Doren] and Ian [Sadler] related to the houses and then escrowing some cash for ongoing debt service related to these homes." (Def. Ex. 128).

At trial, the parties disputed whether the escrowed funds were properly handled by Knight. The Government argued that Knight did not pay out the funds in accordance with his duty as escrow agent, while the defense argued that Knight paid out the funds as contemplated by the escrow agreement and/or pursuant to instructions by the parties to the agreement.[13]  Three of the four Timber Trails lots were sold by June 2008, and the fourth lot sold in October 2009 after having been under

_____

[13] Numerous emails evidence Barber and Van Doren's agreements to release escrowed funds for various reasons and Knight's agreement to act at their direction in releasing those funds.  *See, e.g.*, Def. Exs. 31, 33, 37, 38, 39.

a lease-to-buy agreement for a period of time, which ultimately fell through.  (Def. Exs. 31, 50, 62, 194; Gov't Ex. 17).  Most of the funds from the escrow account were released to Barber by June 2008.  On June 3, 2008, Van Doren informed Knight that he agreed, at Barber's suggestion, that the amount of the funds held in escrow could be lowered to $30,000 to cover any expenses for the fourth, unsold house.  (Def. Exs. 180, 181).

As another facet of the Ballpark transaction, EIA, Outfield Development, and Epsilon entered into an indemnification agreement whereby EIA and Epsilon agreed to indemnify Outfield Development for a portion of Outfield Development's loan obligations to First Federal.  In return, EIA and Epsilon were to share in any profits generated by the property.  (Def. Ex. 133).

On the same day that the Ballpark transaction was funded by First Federal and $688,000 from that transaction was placed in Knight's trust account, First State Bank ("First State") force-closed fourteen bank accounts held by Barber personally and on behalf of his various entities.  Christy Bennett, a Barber Group employee, picked up cashier's checks for each of the closed accounts at First State and later met with Barber and Knight.  At that meeting, Barber represented to Knight that he was on his way to New York, had business expenses that needed to be paid, and no longer had an account out of which to pay them.[14]  Knight agreed to allow Barber to place the money from those cashier's checks, totaling approximately $53,000, into his trust account.  That same afternoon, after receiving a request from Bennett and approval from Barber, Knight wrote out 11 payroll checks to Barber Group employees (or former employees owed checks), a check to Cox Communications for

---

[14] Barber, at various points in time, also represented to Knight and others that he was unable to open a bank account.  This claim is not entirely credible.  While Barber may have had difficulty opening an account at a bank in Northwest Arkansas that he did not owe money to, Barber did have accounts open in his name or in the name of one of his business entities at various times throughout 2008 and 2009.

-11-

Barber Group's office bill, a check to MetLife to cover dental insurance for employees, and a check to Loren Ray—a Barber Group employee—to reimburse her for travel expenses she incurred on Barber's behalf.  (Gov't Ex. 37).  The total amount of these issued checks was $13,925.40.  *Id.*

The first Timber Trails house sold on April 4, 2008; the second on April 25, 2008; and the third on May 25, 2008, thereby authorizing the release of some portion of the $688,000 in escrowed funds to Barber, as representative of EIA.  As discussed above, it is not entirely clear how much money should have been released upon or before the sale of each house.  The escrow agreement does not address this issue specifically, but the parties appear to have contemplated that the amount of funds released would represent the amount of liability Epsilon had for each particular lot.  Accepting Van Doren's understanding that the amount of any principal loan balance would be released upon the sale of each house (Def. Ex. 128), approximately $150,000 would have been authorized to be released with the sale of the first lot on April 4, 2008, *id.*; an unknown amount (the Court estimates an amount similar to the other three lots of $150,000) would have been released on April 25 for the sale of the second lot;[15] and $160,000 would have been released on May 22, 2008 with the sale of the third lot (Def. Ex. 62).

On April 9, 2008, Christy Bennett opened a bank account at First Security Bank in the name

---

[15] The settlement sheet for this lot shows a sales price of $35,000.  (Def. Ex. 50).  However, the seller is listed as SCB Investments, LLC—not Epsilon.  *Id.*  It is not clear why this lot would have been sold for substantially less than the other three lots.  The Court therefore estimates that Epsilon's liability as to the second lot would have been similar to its liability on the other three lots. This is consistent with Van Doren's testimony that Epsilon borrowed approximately $150,000 for each Timber Trails lot for a total of $600,000.  Van Doren also testified that the approximately $600,000 that would have remained in the escrow account after payment to Epsilon of $90,000 would represent the remaining loan balances on the four Timber Trails homes.  This, however, is not accounting for the various other amounts paid out of the escrowed funds with Van Doren's agreement, including the $32,000 paid to Van Doren personally for loans he testified he had made to Barber.

of Barber Group. She confirmed this in an email to Knight when asking him to write a check to Barber Group on April 11, 2008. (Gov't Ex. 38). On April 11, 2008, Knight wrote checks for $21,000 to Barber personally and $15,000 to Barber Group. *Id*. Thereafter, as evidenced by numerous emails, Knight made periodic payments out of the trust account to either a Barber entity or Barber personally at the request of Barber, Bennett, or both. Both the $688,000 in escrowed funds, as well as other funds from Barber, were held in Knight's same trust account. Although some attempt to maintain a separate accounting was made, it is not always clear whether disbursements from the trust account were made using funds deposited by Barber into the account or using funds freed up to be released to Barber pursuant to the escrow agreement with Epsilon.

### B.     Spring Creek Transaction

The second large real-estate transaction discussed at trial was referred to by the parties as the "Spring Creek transaction," which closed on June 3, 2008. The Spring Creek property was a 24-acre tract of land in Lowell, Arkansas owned by Jeff Whorton.[16] Whorton testified that he agreed to sell the property to Barber for $1,200,000, although he had an appraisal stating the property was worth $1,700,000. Barber, again through EIA, was the middle man in a land flip between Whorton[17] and Bob Gaddy that occurred on the same day. Whorton's entity, Whorton Construction of Northwest Arkansas, Inc., sold the property to EIA for $1,200,000. (Gov't Ex. 34a). Barber arranged for

---

[16] Jeff Whorton is and was also involved in real estate development in Northwest Arkansas and was involved in various transactions—both proposed and realized—with Brandon Barber in 2008 and 2009. Whorton pleaded guilty in a separate case to conspiracy to commit bank fraud and money laundering in connection with the Executive Plaza transaction, discussed below.

[17] Jeff Whorton testified that he did not know that Barber resold the property on the same day. Whorton testified that he believed he received fair value for the property from Barber—that he sold the property to Barber for what he thought it was worth.

Gaddy, through Gaddy's entity Spring Creek Holdings, LLC, to purchase the property with a $2,100,000 loan from First Federal Bank.  (Gov't Ex. 34b).  EIA netted $900,000 in the land flip, less closing costs and other expenses paid out of the proceeds.  EIA, however, never received any money from the transaction.  At the closing of the transaction, Gaddy received a disbursement of $499,746 and Barber received a disbursement of $390,204.  *Id*.  From the $390,204 received by him, Barber obtained two cashier's checks issued at First Security: one for $50,000 payable to Knight for legal fees, and one for $340,204 payable to Barber.

Barber (personally, not as EIA) signed an indemnification agreement with Gaddy in which Barber agreed to assume and be responsible for fifty percent of the principal amount of the $2,100,000 loan.  (Gov't Ex. 115).  Under the agreement, Barber was entitled to a fifty percent profits interest in the property unless there was a default.  *Id*.  Barber also agreed to execute a promissory note in an amount "consistent with the financial benefit derived by Barber as a result of Spring Creek incurring the Loan," with such promissory note becoming effective upon an "Event of Default."  *Id*.

Donna Stewart, who had also prepared the closing documents for the Ballpark transaction, prepared the HUD statements for the Spring Creek transaction.  Barber forwarded the HUD statements to Knight on the evening of June 2, 2008, the night before the closing.  (Gov't Exs. 31-32).  There was no responsive email from Knight in evidence.  Assuming Knight received those emails, Knight knew—at least the night before closing—that the Spring Creek transaction was in the nature of a land flip with EIA as the middle man.  Also, on July 9, 2009 (over one year later), Knight apparently reviewed the closing documents for Spring Creek and noted that Barber had a promissory note showing that he owed $390,000 to Bob Gaddy.  (Gov't Ex. 115).

-14-

On June 5, 2008, Barber deposited the $340,204 cashier's check into a personal bank account he then had open at Priority Bank. According to testimony by Government Agent Steve Williams,[18] on June 10, 2008, Barber wired $200,000 from his Priority Bank account to one of four bank accounts he held at Citbank in New York ("Citbank Account 1"). On July 15, 2008, Barber transacted two wires of approximately $98,000 each from Citbank Account 1 to two other Citbank accounts in his name (or in his name as a trust for one of his children) ("Citbank Accounts 2 and 3"). On August 11, 2008, Barber transferred a little over $95,000 from each of Citbank Accounts 2 and 3 to a fourth Citbank account in his name ("Citbank Account 4"). On August 12, 2008, Barber then transferred the approximately $191,000 from Citbank Account 4 to the Knight Law Firm business account. (Def. Ex. 68). Knight kept $40,000 in fees and moved the remaining $151,000 into his trust account. *Id.* On August 15, 2008, Knight transferred $95,000 by check from his trust account into Barber's personal account at Priority Bank to be used to pay Barber's personal Citbank credit card bill. (Def. Exs. 69, 71). This transfer is the subject of Count 4. The deposit, however, was not made in time, and Citbank returned payment for insufficient funds. (Def. Exs. 139, 140). When Christy Bennett went to Priority Bank to attempt to wire the funds to Citbank to get the credit card bill paid, she was told that Priority Bank had force-closed Barber's account. *Id.* On August 19, 2008, Barber then placed $96,483 from the forced closure of his account at Priority Bank back into Knight's trust account. (Def. Exs. 69, 72). On August 21, 2008, Knight wired $95,230 from his trust account to Citbank for payment of Barber's credit card account. This transfer

---

[18] Although there are some Citbank account records in evidence, the records were not used extensively at trial. Rather, the Government relied on Agent Williams to testify as to the contents of those records. The Court did not engage in its own independent forensic accounting of these records and, instead, also relies on the testimony of Agent Williams.

is the subject of Count 5.

On June 25, 2008, Barber placed a $21,612 cashier's check from Priority Bank into Knight's trust account to cover the interest payments owed by both EIA and Epsilon to Outfield Development. (Def. Ex. 64).  On July 1, 2008 Knight issued two checks from his trust account to pay interest owed by EIA ($7,204) and Epsilon ($14,408) to Outfield Development as a result of the Ballpark transaction's indemnification agreement.  (Def. Ex. 65).  Prior to this payment, Knight inquired of Barber via email "I assume you are going to wire your portion and Jimmy's [(Van Doren)] ($21,612.63) to me so that it can appear to first federal and others that you aren't paying the money? Correct?"  (Gov't Ex. 71).

The Legacy Bank foreclosure judgment against Barber (and others) on the Legacy Building was filed in late July 2008.  (Def. Ex. 1, p. 3).

On September 29, 2008, Barber received a $64,000 check as a payment for use of his box at Texas Stadium.  (Def. Exs. 135-136).  Barber ultimately endorsed this check over to Van Doren, who deposited the check into Van Doren's personal account at Citibank.  The money was not to be used by Van Doren but, rather, was to be used to pay Barber's bills or expenses.  Knight testified that  he had no knowledge of this check until Van Doren gave a deposition in Barber's bankruptcy adversary proceeding in 2010.

## C.    Executive Plaza Transaction and the Old Missouri Office Building

In September and early October of 2008, Barber was attempting to structure the third big real estate transaction discussed at trial, which was referred to as the "Executive Plaza transaction."  The Executive Plaza transaction ultimately closed on October 7, 2008.  The Executive Plaza property was commercial property in Springdale, Arkansas composed of six lots owned by Jeff Whorton.  At the

time he was structuring the Executive Plaza deal, Barber was also trying to sell his personal residence in Springdale to Whorton, but Whorton was not initially interested.  Whorton testified that he later told Barber that he would buy Barber's personal residence if Barber would find a buyer for Whorton's Executive Plaza property and obtain favorable financing for Barber's residence.  Barber arranged for Gary Combs[19] to purchase five of the six Executive Plaza lots and for Brandon Rains[20] to purchase the remaining lot.  Combs and Rains obtained financing from First Federal Bank to close the transaction.

With Barber structuring the deal, Whorton agreed to pay a kickback of $550,000 to Combs and $100,000 to Rains out of closing proceeds to induce them to purchase the property.  Whorton also originally agreed to pay Barber $400,000 as a supposed commission or finder's fee for arranging the transaction.  Whorton testified that the purchases by Combs and Rains were conditioned on Whorton paying out those cash kickbacks after closing.  Prior to the closing, Knight helped Barber to form a new entity, NWARE Investments, LLC ("NWARE") that could accept the expected payments to Barber resulting from the Executive Plaza transaction.  The articles of organization for NWARE were filed on October 6, 2008, one day before closing.

After closing, Whorton wrote checks to Combs and Rains for the agreed upon kickbacks, and

---

[19] Gary Combs was identified as the "unindicted co-conspirator" alleged to have been involved in fraudulent activity stemming from the Executive Plaza transaction in a related case with Barber, Whorton, and Brandon Rains.  Combs died some time before these criminal proceedings began.

[20] Brandon Rains was a project manager for Barber Group who had previously helped structure the Ballpark transaction.  Rains described himself as the detail man in the real estate transactions.  Rains pleaded guilty in a separate case to making a false statement to a federal agent in connection with the Government's investigation of the Executive Plaza transaction.

a check in the amount of $394,000 to NWARE.[21]  Barber became concerned with the check because it was written on Legacy Bank, which had the foreclosure judgment against him.  A few weeks later, Barber returned the $394,000 check to Whorton and asked Whorton to instead wire the money to Knight's trust account.  At this time, Whorton negotiated the payment to Barber down to $314,000.  On October 31, 2008 (over three weeks after the Executive Plaza closing), Whorton wired $314,000 to Knight's trust account, at Barber's instruction, and without conversing with Knight.  Whorton issued a W-9 form to NWARE Investments, LLC on October 9, 2008.  (Gov't Ex. 49).  Barber later asked Whorton to change the W-9 form to Brandon Barber, and Whorton issued a W-9 for Brandon Barber on October 15, 2008.   (Gov't Ex. 50).  In June 2009, Barber instructed Christy Bennett to have Whorton's accountant issue a W-9 to Barber Properties, LLC instead.  (Gov't Ex. 43; Def. Ex. 114).  A "corrected" IRS form 1099 was then issued to Barber Properties, LLC instead of Brandon Barber individually.  (Gov't Ex. 52).

According to testimony, Whorton bought another property referenced by the parties as "the Old Missouri office building" from Barber for $1,650,000.  Whorton obtained a loan for the purchase from First Federal for $2,150,000.  As a result, Whorton got $450,000 cash out of the sale, which he testified was disclosed to First Federal, as the cash was to be used to make improvements to the Old Missouri property.  There was very little documentary evidence regarding the specifics of this transaction.  Although the Government treated this transaction as a part of the larger Executive Plaza transaction, it is unclear from the evidence and testimony presented how the sale

---

[21] According to testimony by Donna Stewart and Agent David Kimbrough, as a part of the sale of property from Whorton to Combs, Combs agreed to pay $200,000 to pay down the mortgage on Barber's personal residence.  The $200,000 was paid directly to First Federal.  This money did not, therefore, go through Knight's trust account and was not a major point of contention at trial.

of the Old Missouri office building was related to the sale of the Executive Plaza lots other than the fact that both Whorton and Barber were involved in each transaction. The closings also apparently occurred either on the same day or very close in time. One significant difference between the transactions is that Combs and Rains were the borrowers from First Federal in the Executive Park transaction and Whorton was the borrower from First Federal in the Old Missouri transaction.

On the morning before the Executive Plaza transaction, Knight emailed Ney, counsel for Legacy Bank, asking that Legacy Bank release a third-priority lien on the Old Missouri property so that Barber could sell the property to Whorton. Knight represented that the sales proceeds would not be enough to cover even the first-priority lien. Ney agreed to entry of a consent judgment to release Legacy Bank's lien.

In October 2008, Barber began trying to arrange another deal involving Barber, Epsilon, and Whorton. In order to facilitate this anticipated deal Barber planned to infuse capital into Epsilon, so that Epsilon—as a more credit-worthy borrower than Barber at this time—could obtain a loan from Bank of Fayetteville to fund the anticipated deal. Whether related or not, three things happened in late October. First, while in New York to discuss this anticipated deal with Epsilon, Barber delivered a briefcase to Van Doren that contained $30,000 in cash. Barber asked Van Doren to put it in a safe place because he didn't feel comfortable keeping it with him. The money was to be used for Barber's benefit. Van Doren put the briefcase in a safe deposit box in New York. Second, on the same day, Van Doren opened a business account for Epsilon in order to receive the expected capital infusion for the anticipated deal with Barber and Whorton. When he opened the account, Van Doren told the bank that he anticipated both that Epsilon would be taking on a new member who would provide additional capital and that he expected the contribution to be $350,000. (Def.

Ex. 116).  Third, the next day—October 31, 2008—Whorton wired $314,000 into Knight's trust account (the negotiated amount paid to Barber as a result of the Executive Plaza transaction).

On November 10, 2008,[22] Van Doren emailed Knight and Dan Rubin (Barber's counsel in New York), with copies to Ian Sadler and Barber, and stated that after seeking advice of counsel in New York, Epsilon did not want to take Barber on as a member and instead would engage with Barber in some sort of consulting-fee deal on the anticipated transaction. (Gov't Ex. 23; Def. Ex. 115).  Barber agreed to that arrangement.  *Id*.  It was agreed that $150,000 would be sent from Knight's trust account to the Epsilon business account.  *Id*.  That same day $150,000 was, in fact, transferred from Knight's trust account to the Epsilon business account.  Ultimately, Bank of Fayetteville rejected Epsilon's loan application on the anticipated deal, and the deal did not occur. (Def. Ex. 121).  Van Doren and/or Epsilon kept all but $27,000 of the $150,000 supposedly to cover losses Epsilon incurred on Sloan Estates.  Epsilon did not sell Sloan Estates until February 2009.  The $27,000 was wired by Van Doren to the NWARE account on March 1, 2009.

At this point in time, the relationship between Barber and Van Doren was becoming contentious.  While emails around this time indicate that Van Doren was still interested in possibly pursuing deals with Barber (*see, e.g.*, Gov't Ex. 100), Van Doren testified that he was cutting ties with Barber.  On March 5, 2009, Van Doren mentioned in an email that he thought Barber was looking at filing for personal bankruptcy in the near future.  *Id*.  Fearing that Barber might soon file for personal bankruptcy, Van Doren had an attorney draft a letter to Barber dated March 18, 2009,

---

[22] Also on November 13, 2008, Barber sent an email to Knight, Van Doren, and Stacey McSpadden, optimistic about the fact that he had been able to reduce his debt from $269,000,000 to $38,000,000.  (Def. Ex. 27).  Knight responded that the debt reduction was "Amazing!!!" and encouraged Barber to keep thinking in that vein.  *Id*.

characterizing the $150,000 payment to Epsilon as payment for an "antecedent debt" for Epsilon's

losses on the Sloan Estates debt.  (Def. Ex. 112).  It is unclear how Barber would have owed a debt

for Epsilon's losses in that deal or how the losses would have been antecedent to the November 2008

payment when Sloan Estates was not sold at a loss until nearly four months later.  However, once

the $150,000 hit the Epsilon account, Barber had no legal claim to the money (especially as he did

not become a member of Epsilon at Van Doren's request), and it appears that Van Doren ultimately

determined that he could use the money as he saw fit.  Another letter was written to Barber on April

15, 2009 on behalf of Epsilon, purporting to account for the losses incurred by Epsilon and the way

the $123,000 ($150,000 minus $27,000 ultimately refunded to Barber) was used to cover those

losses.  (Def. Ex. 111).  The April letter also set forth that Epsilon viewed that it was still owed

money by Barber for additional losses.  *Id*.

Towards the end of 2008, Barber Group was going out of business due to mounting tax

liabilities for which the IRS began to demand payment in July of 2008.  (Def. Ex. 6).  On November

3, 2008, an insurance agent emailed Christy Bennett to let her know that "BlueCross has been told

that The Barber Group is out of business and is asking questions.  We need to address this or they

will cancel the group."  (Def. Ex. 4).  Bennett immediately emailed Barber and Knight saying that

they had to get a new entity formed so that they could transfer the insurance over.  *Id*.  At the time,

Bennett, who received insurance coverage through Barber Group, was pregnant.  She testified that

she could not afford for her insurance coverage to lapse.  The next day, November 4, 2008, the

insurance agent again emailed Bennett and told her that if they did not get information for a new

entity to BlueCross that day, she was afraid BlueCross would cancel the insurance group and not

transfer it to a new entity.  (Def. Ex. 5).  Bennett again forwarded the email to Barber and Knight,

-21-

marked high importance, and asked them to let her know what to tell the agent.  *Id.*

Although NWARE was formed on October 6, 2008 with the intent that it be used to accept payments generated as a result of the Executive Plaza transaction, the operating agreement was not forwarded to Barber for his signature until November 7, 2008.  (Gov't Ex. 40).  In putting the final touches on getting NWARE together, Knight suggested on November 11, 2008, that Bennett's home address be used as the address for NWARE, as he would rather it not have the same address as Barber Group.  (Gov't Ex. 41).  Bennett and Barber agreed.

On November 21, 2008, Knight made out a check for $20,000 from his trust account to an account held by NWARE at First Security Bank ("the NWARE account").  This transfer is the subject of Count 6 of the fourth superseding indictment.  On December 18, 2008, Knight made out a check for $20,000 from his trust account to the NWARE account.  This transfer is the subject of Count 7.  On January 16, 2009, Knight made out a check for $15,000 from his trust account to the NWARE account.  This transfer is the subject of Count 8.  By January 21, 2009, the funds allocated to Barber in Knight's trust account were depleted, and there was no other activity into or from Knight's trust account regarding funds of Barber or any of his entities.

Meanwhile, on November 26, 2008, Legacy Bank obtained a deficiency judgment against Lynnkohn, Brandon Barber, and the other personal guarantors on the Legacy building loan in the amount of $8,400,000 in the Legacy building foreclosure action.  On December 29, 2008, Legacy Bank filed detailed discovery requests in an attempt to locate any Barber assets that it might be able to use to collect on its deficiency judgment.  Barber, with Knight as his attorney, responded to Legacy's discovery requests on February 23, 2009.  (Def. Ex. 2).  The NWARE account was disclosed, but EIA was not disclosed as a Barber entity, nor was Knight's trust account listed

anywhere (at this point, it appears Barber had no more funds in the trust account). *Id*. The responses to Legacy Bank's interrogatory were verified under oath by Barber with Knight's signature on the filing as the submitting attorney. *Id*. On March 2, 2009, Marshall Ney complained to Knight via email that the responses to Legacy Bank's discovery were deficient. Ney, on behalf of Legacy Bank, later filed a motion to compel more complete responses. The state court granted the motion and ordered Barber to serve complete responses to Legacy Bank's discovery requests by May 22, 2009.[23] (Def. Ex. 15). Barber did not meet that deadline, and Ney filed a motion for contempt against Barber. *Id*. On June 29, 2009, the state court issued an order for Barber to appear before that court on July 24, 2009 to show cause as to why he should not be found in contempt of court for his failure to comply with the court's earlier order. *Id*. Barber's discovery responses were then supplemented on July 14, 2009. (Def. Ex. 2). NWARE was again disclosed, but EIA and Knight's trust account were not. *Id*. The supplemental responses were again verified under oath by Barber, but Lauren Pratchard, an associate at the Knight Law Firm, signed as the submitting attorney. *Id*.

At the same time as Barber and his team and Knight and his associates were gathering information to respond to Legacy Bank, Christy Bennett was also working with Vera Crider[24]—with some input from Knight or his associates—to get tax information to Wanda Lanier, a CPA retained by Barber. Therefore, the documentary evidence in this case tends to overlap tax information, information related to the Legacy Bank discovery, and also information required for Barber's personal bankruptcy proceeding. Bennett requested a meeting with Barber and Knight to discuss the

---

[23] It appears the order was not filed of record until May 26, 2009.

[24] Vera Crider was a former Barber Group employee who continued to do some work with Barber Group on a consulting basis after she left the company.

Ballpark transaction to get everything straight for tax purposes.  She recalled that a meeting took place where both Barber and Knight were present sometime in July 2009.  She took notes from some meeting about the Ballpark transaction.  (Gov't Ex. 45).  Knight did not recall being in such a meeting with Bennett and Barber.

### D.      Brandon Barber's Personal Bankruptcy

On July 31, 2009, Barber, with Knight as his attorney, filed for Chapter 7 bankruptcy. Initially, only a skeletal petition containing limited information was filed.  The filings were supplemented on September 11, 2009 (Gov't Ex. 55b) and then amended on October 31, 2009 (Gov't Ex. 55c).  One more amendment was made on August 18, 2010 (Gov't Ex. 55d), but that amendment was not an issue of major contention in this case.  Barber agreed to pay Knight $20,000 for his services in the bankruptcy case, inclusive of a $299.00 filing fee.  (Def. Ex. 148).  The employment agreement stated that the fee was only for work through the first meeting of creditors and that Barber would have to pay Knight his current hourly rate for any work beyond that meeting, including, but not limited to, adversarial proceedings.  *Id*.

From the evidence, it appears that Christy Bennett collaborated mainly with Mason Wann and Lauren Pratchard—Knight's associates—in collecting information to put on Barber's bankruptcy filings.  On September 8, 2009, Bennett sent Wann a preliminary copy of the Statement of Financial Affairs ("SOFA") with "the beginnings of the questions [she could] answer" and stating that she would send more information as she was able to get it.  (Def. Ex. 106; *see also* Def. Ex. 143).  Wann responded to Bennett's questions, including advising Bennett that Barber's personal payments out of the NWARE account would need to be disclosed, as the court would consider such payments as income to Barber.  *Id*.  Bennett sent entity lists to Wann on September 10, 2009.  (Def. Ex. 98).

-24-

John Terry Lee was appointed as trustee in the bankruptcy case. Lee has been a bankruptcy attorney for more than 30 years and is a highly experienced bankruptcy trustee. Lee examined the petition, schedules, and SOFA in an effort to locate assets for the bankruptcy creditors. Lee testified that he found many deficiencies in the filings. In response to the September 11 filings of the supplemented bankruptcy schedules, Lee wrote a letter to Knight dated September 15, 2009, in which he asked Knight some questions raised in his mind by the disclosures. (Gov't Ex. 56).

Knight responded to Lee by letter dated September 17, 2009. (Gov't Ex. 57). In order to respond to Lee, Knight asked Barber and Bennett to send him a HUD statement for Barber's house as well as the three most recent bank statements for NWARE. (Def. Ex. 96). Without copying Knight, Barber told Bennett not to send Knight the most recent NWARE statement. (Def. Ex. 97). As a result, Knight's representation to Lee that he was sending the three most recent NWARE statements (Gov't Ex. 57) was not correct. Knight told Lee that he would supplement a complete list of Barber's business entities at a later date. *Id*. Lauren Pratchard sent additional documentation to Lee on October 23, 2009. (Def. Ex. 149). In the same email, she represented to Lee that Knight would be out of town the majority of the next week but that she would be available to provide additional information prior to the next meeting of creditors. *Id*. Lee testified that the amendments filed on October 31 did not really answer his questions and that EIA should have been disclosed.

On February 19, 2010, Legacy Bank filed an adversary proceeding ("AP") against Barber in bankruptcy court, objecting to a discharge of Barber's debt. Legacy Bank did not believe that Barber had made truthful disclosures in his bankruptcy filings. Until the week before the AP went to trial, Barber was proceeding pro se as to the AP, as the bankruptcy representation agreement with Knight did not extend to representation during any adversary proceedings. On July 23, 2010, Marshall Ney

deposed Van Doren in relation to the AP.  Van Doren indicated during the deposition that he had no idea what happened to the $688,000 that was escrowed with Knight after the Ballpark transaction but he knew that it did not all go to Epsilon as indicated by the HUD statement showing a "payoff to Epsilon."[25]  Van Doren led Ney to believe that a small amount of the money was escrowed.  At the time of the deposition, Ney had in his possession the escrow agreement between Barber and Van Doren outlining how the $688,000 was to be handled.  Ney testified during trial that the escrow agreement had been Bates stamped by his office prior to the deposition, but that he had no memory of having had the document available to him.  Because it appears that Ney had not actually reviewed the escrow agreement in his possession, the confusion as to the whereabouts of the $688,000 continued into the AP proceeding.  Ultimately, the "unexplained location" of the $688,000 merited a mention in Judge Barry's final order, which spurred further investigation of Knight.  During his deposition, Van Doren also told Ney about the $64,000 check Barber signed over to him and about the $30,000 cash in a briefcase, but did not say anything about the $150,000 transfer to Epsilon. Barber, still proceeding pro se, was not present for the Van Doren deposition, so there was no cross-examination.

Knight, although he would not be paid, decided to enter an appearance in the AP on August 12, 2010, the week before the proceeding was set to go to trial.  Knight emailed Ney to ask if Ney would object if Knight moved for a continuance of the trial since he was coming in late in the game. (Gov't Ex. 54).  Ney responded that he would object and that any delay in holding the trial would afford him time to subpoena the records for Knight's trust account, based on questions that were

_____

[25] Ney was not sure how Legacy Bank obtained a copy of the HUD statement for the Ballpark transaction unless it was a part of the discovery materials provided by Barber in the Legacy Bank forfeiture action or in the bankruptcy proceedings.

raised during Ney's deposition of Van Doren. *Id*. Knight accused Ney of unethical conduct in threatening to subpoena his trust records. *Id*. Ultimately—for whatever reason—Knight did not move for a continuance, Ney did not subpoena Knight's trust account records, and the AP went to trial as scheduled. Prior to the trial, Knight expressed concern to Barber about Van Doren's deposition testimony that Barber had given him $64,000. (Def. Ex. 105). Barber told Knight that he did not disclose that transfer because he didn't think the money was income. *Id*.

After reading Van Doren's deposition, Knight consulted with University of Arkansas professor of law Tim Tarvin. (Def. Ex. 137). Among other things, Knight asked Tarvin whether he should amend the bankruptcy schedules to account for the $64,000 and $30,000 transfers. *Id*. Tarvin advised Knight to amend the petition and schedules and to explain that Knight was not aware of those transfers until reading the deposition. *Id*. Knight did not ultimately amend the petition or schedules to list the $64,000 or $30,000 transfers. Knight testified that, after getting more information about the nature of the transfers from Barber, Knight ultimately decided that disclosure of those transfers was not required.

The trial of the AP, before United States Bankruptcy Judge Ben Barry, began on August 19, 2010, and lasted only about a day and a half. On the evening after the first day, Knight emailed Wann, his associate, saying that Barber did not do well on the stand and got caught in a couple of lies. (Def. Ex. 177). Knight told Wann that he thought Judge Barry would deny Barber a discharge because Barber lied about the fact that he did not have a bank account when he transferred the $64,000 to Van Doren. *Id*. Knight told Wann that Ney was able to walk Barber through three or four accounts that were open in his name at that time and that Barber had "told us a long time ago those accounts were closed." *Id*.

-27-

Judge Barry entered an order on November 9, 2010, denying Barber a discharge pursuant to both 11 U.S.C. § 727(a)(2)(A) and § 727(a)(4)(A).  Under § 727(a)(2)(A), Judge Barry found that Barber's discharge should be denied because of Barber's use of both NWARE and James Van Doren to transfer and conceal his funds with intent to place the funds beyond the reach of creditors, within one year of the date of filing his bankruptcy petition.  (Gov't Ex. 55f).  Under § 727(a)(4)(A), Judge Barry found "that Barber failed to disclose (1) the $2,225.13 balance held in the NWARE account on the date Barber filed his bankruptcy petition, (2) Barber's claim for a commission from Justin Salter, and (3) the total amount of loans from Justin Salter."  *Id*. at p. 18.  Judge Barry found that those omissions amounted to statements made with fraudulent intent and with knowledge that the statements were false.  *Id*. at p. 25.  In a footnote, the order also raised questions as to "[t]he unexplained location of approximately $588,000.00 [sic] that was transferred to the Knight Law Firm as a payment to Epsilon, but that Van Doren said he never received."  *Id*. at p. 27 n.1.  The transfers through Knight's trust account were not, however, included as a basis for denial of Barber's discharge.

After receiving Judge Barry's opinion, John Terry Lee emailed Knight on November 17, 2010, to ask about the $688,000 (identified as $588,000 in Judge Barry's opinion).  (Gov't Ex. 58).  Lee requested bank records to account for the funds.  *Id*.  Knight responded on the same day that he did not recall the specifics of the transaction and would need to seek permission from Barber to turn over the records absent a court order.  *Id*.  Knight did eventually respond to Lee with records, which Lee reviewed with a forensic accountant.  Lee testified, however, that he did not pursue the matter further as trustee because he did not have sufficient trustee funds to make it worthwhile to try to locate any assets that might be reached from the escrow fund.  Lee inquired as to why Barber used

-28-

Knight's trust account in the manner he did and was told that it was because Barber was unable to open a bank account to deposit funds. Lee did not find this explanation to be credible. He testified that he made a criminal referral regarding Barber to the United States Trustee for Arkansas based on the issues raised in Judge Barry's opinion and order. No referral was made as to Knight.

On July 8, 2010, Ney, along with a former United States Attorney who then worked in the same law firm, had already met with government agents regarding possible criminal activity by Barber. The government investigation began at that time.

## III.    Legal Analysis

Knight moves the Court to set aside his conviction and to enter a judgment of acquittal as to all counts. Pursuant to Rule 29 of the Federal Rules of Criminal Procedure, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." When reviewing the sufficiency of the evidence to support a jury verdict the Court must "view[] the evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." *United States v. Ellefson*, 419 F.3d 859,862 (8th Cir. 2005) (quotation omitted). The Court may reverse a conviction "only if no reasonable jury could have found the accused guilty beyond a reasonable doubt." *Id*. (internal quotation omitted). "In ruling on a motion for a judgment of acquittal, the role of the court is not to weigh evidence but rather to determine whether the Government has presented evidence on each element to support a jury verdict." *United States v. Boesen*, 491 F.3d 852, 857 (8th Cir. 2007) (internal quotation omitted). "A jury verdict may be based on circumstantial as well as direct evidence, and the evidence need not exclude every

-29-

reasonable hypothesis except guilt." *Ellefson*, 419 F.3d at 863 (internal quotation omitted). "In determining the strength of the evidence in a circumstantial case, it is the totality of the circumstances that must be weighed in making a decision on a motion for acquittal." *United States v. Water*, 413 F.3d 812, 817 (8th Cir. 2005). If all the evidence presented "rationally supports two conflicting hypotheses," the conviction should not be disturbed. *United States v. Baker*, 98 F.3d 330, 338 (8th Cir. 1996).

Knight moves in the alternative for the Court to grant him a new trial as to all counts for which a judgment of acquittal is not entered. Rule 33(a) of the Federal Rules of Criminal Procedure provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." The district court is granted broad discretion in deciding motions for new trial, and its decision is subject to reversal only for a clear and manifest abuse of discretion. *United States v. Amaya*, 731 F.3d 761, 764 (8th Cir. 2013). In a motion for new trial, the court is not bound by the same standards as required in reviewing a motion for judgment of acquittal. In assessing whether a defendant is entitled to a new trial on the ground that the verdict is contrary to the evidence, "a district court may weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict." *Id.* (internal quotation omitted). Despite its broad discretion, the Court is mindful that it should exercise its authority to grant a new trial "sparingly and with caution." *United States v. Vore*, 743 F.3d 1165, 1181 (8th Cir. 2014) (quotation omitted). The Court may, however, grant a motion for a new trial "if the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred." *Id.* (quotation omitted).

In order for the Court to rule on the motions, the Court had to review all of the evidence and testimony submitted to the jury during the nine-day trial. The Government called 16 witnesses in

their case in chief, Knight called 8 witnesses in his defense, and the Government called 2 rebuttal

expert witnesses. Between the parties, there were approximately 300 exhibits received into evidence.

All of this evidence and testimony must be viewed against the elements of the separate offenses for

which the defendant was indicted. The Court will address each motion in the context of each Count

charged.

**A.    Count 1: Conspiracy to Commit Bankruptcy Fraud**

As set forth in the Court's final instructions to the jury,[26] to convict Knight on Count 1,

conspiracy to commit bankruptcy fraud in violation of 18 U.S.C. §§ 371 and 157, the Government

had to prove beyond a reasonable doubt that:

1.    On or between January 1, 2008 and November 9, 2010, two or more persons reached an agreement or came to an understanding to commit bankruptcy fraud by transferring income and funds belonging to Brandon Barber to and through accounts belonging to the defendant and James Van Doren to hide the income and funds from creditors;

2.    The defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect;

3.    At the time the defendant joined in the agreement or understanding, he knew the purpose of the agreement or understanding; and

4.    While the agreement or understanding was in effect, a person or persons who joined in the agreement knowingly committed [an overt act] for the purpose of carrying out or carrying forward the agreement or understanding.

This instruction is in line with Eighth Circuit case law on conspiracy. *See, e.g.*, *United States v.*

*Foster*, 740 F.3d 1202, 1205 (8th Cir. 2014) (stating that to support a conspiracy conviction, the

---

[26] The jury instructions set forth in this opinion are taken from the Court's records as to the jury instructions used at trial and are, to the Court's knowledge, the same as the instructions given to the jury in this case both orally and in written form.

Government was required to show (1) an agreement between the defendant and one or more persons to commit fraud, (2) that the defendant knew of the agreement, and (3) that the defendant intentionally joined in the agreement); *United States v. Dolan*, 120 F.3d 856, 868 (8th Cir. 1997) ("To prove a conspiracy, the government must demonstrate that an agreement existed between two or more people to commit an offense and that one or more of the conspirators acted to affect the object of the conspiracy."). "The government must prove beyond a reasonable doubt that the defendant had knowledge of the essential object of the conspiracy." *Dolan*, 120 F.3d at 868. The Eighth Circuit has further stated that a defendant's knowledge of a conspiracy "is generally established through circumstantial evidence, and no direct evidence of an explicit agreement need be introduced to prove a conspiracy, since a tacit understanding may be inferred from circumstantial evidence." *United States v. Benitez*, 531 F.3d 711, 716 (8th Cir. 2008) (internal citation omitted). "Once a conspiracy has been proven, even slight evidence of a defendant's participation is sufficient to support a conviction." *Dolan*, 120 F.3d at 868 (internal quotation omitted).

In order to aid its determination of whether a conspiracy to commit bankruptcy fraud existed, as charged in Count 1, the jury was instructed as follows as to the elements of the substantive offense of bankruptcy fraud:

1.   The defendant voluntarily and intentionally devised or intended to devise a scheme or plan to defraud, with the scheme being to conceal income, assets, and funds from creditors and the bankruptcy court by transferring income, assets, and funds belonging to Brandon Barber into and through accounts belonging to defendant and James Van Doren;

2.   The defendant did so with the intent to defraud; and

3.   The defendant made a material false or fraudulent representation, claim, or promise concerning, or in relation to, a Title 11 bankruptcy proceeding for the purpose of concealing the scheme or plan to defraud.

-32-

"Conspiracy to commit a particular substantive offense cannot exist without *at least* the degree of criminal intent necessary for the substantive offense itself." *United States v. Calhoun*, 721 F.3d 596, 601 (8th Cir. 2013) (quotation omitted) (emphasis in original).  As to Count 1, the Government therefore had to show that Knight knew of and intentionally participated in an agreement the essential object of which was to intentionally devise a scheme to defraud creditors and the bankruptcy court.

The defense argues that the Court should enter a judgment of acquittal as to Count 1 because there was no evidence presented at trial that proved or tended to show that Knight contemplated bankruptcy on behalf of Brandon Barber.  Knight argues that, without some contemplation of bankruptcy, the Government could not satisfy its burden on element three of the conspiracy charge—that at the time Knight joined in an agreement or understanding to commit bankruptcy fraud, he knew the purpose of the agreement.  Knight also argues that the evidence did not show that *anyone* contemplated bankruptcy on behalf of Barber prior to the week before Barber filed for bankruptcy.  Knight argues that the Government could not, therefore, satisfy its burden as to element four of the conspiracy charge—that any person committed an overt act for the purpose of carrying forward an agreement to commit bankruptcy fraud.[27]

In the alternative, the defense argues that the Court should grant a new trial as to Count 1 because the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage

---

[27] The Court notes that in the conspiracy count, Knight was charged with conspiracy to violate 18 U.S.C. § 157.  Section 157 does not include language referencing contemplation of bankruptcy as does 18 U.S.C. § 152(7).  Knight's argument as to Count 1 is, therefore, somewhat misplaced if based on statutory language.  The Court considers Knight's argument in light of the common understanding of a necessity to "contemplate" the eventual object of a conspiracy in order to be found to have knowingly and intentionally joined in that agreement.

of justice will occur if the Court does not grant Knight a new trial. The defense argues that the evidence was lacking in showing that (1) there was an agreement to commit bankruptcy fraud; (2) that Knight had an understanding of the nature of any plan to commit bankruptcy fraud and voluntarily and intentionally joined such plan; or (3) that any overt acts were committed in furtherance of a conspiracy to commit bankruptcy fraud.

### i.   Motion for Judgment of Acquittal

In support of its argument that Knight's motion for judgment of acquittal as to Count 1 should be denied, the Government makes the conclusory statements that "[t]he acts in furtherance of the conspiracy were committed by co-conspirators Brandon Barber, James Van Doren, and Knight. The scheme and object of the conspiracy was the same: to defraud and conceal Barber's assets from the bankruptcy court." (Doc. 191, p. 12). Without citing to any specific evidence or testimony in support of its case, the Government states that:

> There was ample evidence at trial of Knight's agreement to participate in the object of the conspiracy. Much of this evidence has already been mentioned elsewhere in this response. In over nine days of trial, there was more than sufficient evidence introduced that Knight conspired with Barber and Van Doren to commit bankruptcy fraud. Based on this evidence, the jury reasonably found that Knight agreed to enter into and understood the nature of the conspiracy charged based upon the proof offered at trial. Accordingly, the jury's guilty verdict on all counts was based on ample evidence.

The Court is not certain as to what evidence in support of the conspiracy conviction the Government is referring to as having been "mentioned elsewhere." In essence, in support of Knight's conviction on Count 1, the Government states that it presented ample evidence at trial and then concludes that the guilty verdict was based on ample evidence. The Government did not, however, identify any specific evidence, amid the thousands of pages of documents and testimony of 26 individuals, that

supported any particular element of the offense.

Having nevertheless conducted an exhaustive review of the evidence in this case, the Court concludes that the Government's evidence supporting Knight's conviction for conspiracy to commit bankruptcy fraud, as charged, was thin at best.  The trial record is not, however, completely devoid of evidence pointing to guilt.  Making every reasonable inference in favor of the verdict as to Count 1, the evidence at trial showed that Barber was in precarious financial condition throughout 2008, with his situation worsening as time went on.  Knight emailed Barber in early 2008 offering his legal services and representing that he had experience in handling the kinds of issues Barber was dealing with. Barber took Knight up on his offer, thereby retaining Knight ostensibly for the purpose of helping him with his intermingled legal and financial problems.  Because of Barber's precarious financial situation, in particular the fact that Barber was guarantor on the defaulted Lynnkohn loan to Legacy Bank, Knight reasonably knew that Barber would likely have to file for personal bankruptcy at some point in the near future.  Notwithstanding this knowledge, Knight voluntarily agreed to accept large sums of money from Barber into his trust account[28] to be parceled back out to Barber for his own personal use or for the benefit of Barber's various entities.

Certain emails admitted into evidence tended to show that Knight knew that Barber was using his trust account as an alternative to a traditional bank account so that Barber did not have to keep large sums of money in any account in Barber's name for any length of time.  (*See, e.g.*, Def. Ex. 71 (Christy Bennett emails Knight asking for $95,000 check to deposit in Barber's Priority Bank

---

[28] For reasons discussed further below, the Court does not include in this reference the $688,000 that Knight took into his trust account as escrow agent after the Ballpark transaction.  The $688,000 was received pursuant to a valid escrow agreement between consenting parties with no party complaining as to how the escrowed funds were later disbursed.

account, saying she will hold it to deposit only when necessary to cover a payment)). Other emails indicated that Knight knowingly allowed his trust account to be used as a pass-through to disguise Barber as the source of money paid to creditors. (*See, e.g.*, Gov't Ex. 71 ("I assume you are going to wire your portion and Jimmy's [(Van Doren)] ($21,612.63) to me so that it can appear to first federal and others that you aren't paying the money? Correct?")). At no time did Knight refuse to accept Barber's money into his trust account or counsel Barber that he could not act as Barber's personal banker simply because Barber did not want to keep large sums of money in his own account. Knight accepted large sums of money into his trust account even after he was aware that Barber had bank accounts available to him.

At the time that Legacy Bank propounded post-judgment discovery in the foreclosure proceeding, Knight had some of Barber's money left in his trust account. That money, however, was quickly depleted before Barber served untimely answers to the interrogatories. After the money ran out and Legacy Bank was making every effort to collect on its judgment, Barber filed for personal bankruptcy with Knight as his attorney. Neither Barber nor Knight disclosed that large sums of Barber's money had passed through Knight's trust account in the year previous to the filing, although such disclosures were arguably required.

Taking all of this evidence together and making numerous inferences in favor of the verdict, the Court finds that the evidence submitted by the Government was sufficient to show a pattern of conduct intended to defraud the bankruptcy court and to convict Knight of conspiracy to commit bankruptcy fraud as charged in Count 1. "While the government's proof was less than overwhelming, the jury's verdict must be upheld if there is an interpretation of the evidence that would allow a reasonable-minded jury to conclude guilt beyond a reasonable doubt." *Foster*, 640

U.S. at 1208 (quotation omitted).

### ii.    Motion for New Trial

Although the evidence presented was sufficient, by a thin margin, to support Knight's conviction as to Count 1, the Court finds that the evidence weighs heavily enough against the verdict that a miscarriage of justice may have occurred. The Court finds, therefore, that Knight's motion for new trial as to Count 1 should be granted.

The Government presented a lot of evidence as to Barber's activities. However, any evidence as to the extent of Knight's knowledge of and involvement in Barber's schemes was largely speculative and based generally on the fact that Knight was Barber's lawyer. The testimony revealed that the witnesses, except for Knight himself, had little to no direct or personal knowledge of the extent of Knight's knowledge of or involvement with any conspiracy to commit bankruptcy fraud. For example, Jeff Whorton said that he had maybe shaken Knight's hand twice but had never had a substantive conversation with him and had never spoken to him on the phone. Stacy McSpadden[29] testified that Knight was involved in some way in the three real estate transactions, but she was not privy to any conversations with Knight regarding those transactions. John Bracey[30] testified to the fact that Barber and Knight seemed to work closely together, but he had no personal knowledge of particular conversations between Barber and Knight as to any relevant issue in this case. Other fact witnesses testified in a similar vein. No witness testified to having personal knowledge of a conversation between Barber and Knight where a fraudulent scheme, an intention to defraud, or even

---

[29] Stacey McSpadden was a realtor employed by Barber in some manner from 2007 to 2009.

[30] John Bracey worked for Barber in commercial construction from 2005 through early 2008, when both Bracey and Rains left Barber Group to form their own company. That company still continued to work for Barber on a consulting basis for some time thereafter.

a specific intent by Barber to file personal bankruptcy was discussed.  The only two people that would have had personal knowledge of any private conversations between Barber and Knight not memorialized by documentary evidence are Barber and Knight.  Knight testified in his defense and denied his guilt as to all counts.  Barber did not testify.  While the Court recognizes that proof of the existence of a conspiracy may be based on circumstantial evidence, the evidence in this case was so speculative as to raise a real concern as to whether Knight had either knowledge of the purpose of any conspiracy or the requisite intent to carry out the essential object of a conspiracy to commit bankruptcy fraud.

Furthermore, in the civil context, the Eighth Circuit has found that, even where a debtor is facing loan defaults or demands on personal guarantees and has specifically sought the advice of bankruptcy counsel, that there must be extrinsic indicia of fraud in order to find an intent to defraud creditors.  *In re Addison*, 540 F.3d 805, 813 (8th Cir. 2008).  The transfers of Barber's money through Knight's trust account were not *per se* contrary to law.  The transfers would only be contrary to law, at least as to Knight, if Knight acted with an intent to defraud and—in this case—specifically an attempt to defraud Barber's creditors and the bankruptcy court.  Merely putting money beyond the reach of creditors, even on the eve of bankruptcy,[31] is not enough to find an intent to defraud, as the intent to keep value away from creditors is not automatically impermissible.  *Id*. at 814-15. Therefore, the fact that Knight knew that Barber was in a precarious financial condition, offered his legal services, and allowed Barber to pass money through his trust account—even knowing that Barber wanted to keep money away from his creditors—are not facts that weigh heavily in favor of

---

[31] The evidence showed that no more of Barber's money was contained in, or passed through, Knight's trust account after January of 2009—approximately six months prior to Barber filing for personal bankruptcy.

-38-

finding that Knight had the requisite intent to defraud Barber's bankruptcy creditors or the bankruptcy court.  Although the record is replete with documentary evidence, no email or other document was admitted that would otherwise tip the scales in the Government's favor as to this Count.

In an effort to not further belabor the record and because the presentation of evidence in this case was so intermingled as to different counts, the Court also incorporates its findings as to the other Counts as additional support for its finding that the evidence as to Count 1 weighed heavily enough against the verdict such that a miscarriage of justice may have occurred.  Particularly, the evidence as to whether or not Knight made any affirmative material misrepresentations in relation to the bankruptcy proceeding with the purpose of concealing a scheme or plan to defraud was not convincing.  Also, the evidence of any connection between Knight's actions and Barber's eventual filing for personal bankruptcy was underwhelming at best.  The Court therefore cannot find that the evidence preponderated sufficiently in favor of finding that (1) a conspiracy to specifically commit *bankruptcy* fraud existed and (2) that Knight joined in such an agreement with the intent to defraud the bankruptcy court.  The Court finds that Knight should be granted a new trial as to Count 1.

**B.     Count 2: Bankruptcy Fraud—Concealment of Assets**

As set forth in the Court's final instructions to the jury, to convict Knight on Count 2, bankruptcy fraud—concealment of assets—in violation of 18 U.S.C. § 152(7), the Government had to prove beyond a reasonable doubt that:

1.     The defendant contemplated a bankruptcy proceeding as an agent of Brandon Barber;

2.     In contemplation of the bankruptcy proceeding, the defendant transferred or concealed funds that belonged to Mr. Barber, which belonged or would

-39-

belong to the bankrupt estate;

3.     The defendant knowingly concealed or transferred the funds; and

4.     The defendant transferred or concealed the funds with the intent to defraud.

As the Court was unable to find any pertinent controlling authority as to the elements for this offense and the Eighth Circuit has not promulgated a model instruction for this particular subsection, the Court crafted its instruction based primarily on a reading of the statute.

The defense argues that the Court should enter a judgment of acquittal as to Count 2 because there was no evidence presented at trial that proved or tended to show that Knight contemplated bankruptcy on behalf of Barber and that, therefore, the Government could not satisfy its burden as to elements one and two. In the alternative, the defense argues that the Court should grant a new trial as to Count 2 because the evidence preponderates sufficiently heavily against the verdict as to that count that a serious miscarriage of justice will occur if the Court does not grant Knight a new trial.

### i.     Motion for Judgment of Acquittal

The evidence presented by the Government in this case was likely insufficient to support a finding that Knight was guilty of directly committing the substantive offense of bankruptcy fraud—concealment of assets as charged in Count 2. However, given the strict standard to be applied to motions for judgment of acquittal, the Court finds that the evidence was sufficient to support Knight's conviction on Count 2 under the theory that Knight aided and abetted the commission of the offense. As a finding that Knight aided and abetted the offense is sufficient to support his conviction, the Court will direct its discussion of this Count to the sufficiency of the evidence in regard to Knight aiding and abetting the offense.

The jury in this case was instructed as to aiding in abetting, in relevant part, as follows:

In order to have aided and abetted the commission of a crime a person must, before or at the time the crime was committed, (1) have known the offense was being committed; (2) have knowingly acted in some way for the purpose of aiding the commission of the offense; and (3) have intended that the offense be committed.

For you to find the defendant guilty of the offenses of bankruptcy fraud—concealment of assets, false statements or money laundering by reason of aiding and abetting, the Government must prove beyond a reasonable doubt that all of the elements of the offense were committed by some persons [sic] or persons and that the defendant aided and abetted the commission of that crime.

You should understand that merely being present at the scene of an event, or merely acting in the same way as others or merely associating with others, does not prove that a person has become an aider and abettor. A person who has no knowledge that a crime is being committed or about to be committed, but who happens to act in a way which advances some offense, does not thereby become an aider and abettor.

As to criminal liability based on a theory of aiding and abetting, the Eighth Circuit has stated that "[t]here are three essential elements of aiding and abetting: (1) the defendant associated [him]self with the unlawful venture; (2) the defendant participated in it as something [he] wished to bring about; and (3) the defendant sought by [his] actions to make it succeed." *United States v. Mitchell*, 388 F.3d 1139, 1143-44 (8th Cir. 2004). Aiding and abetting "implies some conduct of an affirmative nature and mere negative acquiescence is not sufficient." *Snyder v. United States*, 448 F.2d 716, 718 (1971) (quotation omitted). "By far the most important element is the sharing of the criminal intent of the principal, and this is concededly difficult to prove; nevertheless, the Government must prove this sharing of criminal intent." *Id*. "Mere association between the principal and those accused of aiding and abetting is not sufficient to establish guilt." *Id*.

Again, the Court finds that the Government's evidence as to the essential elements of Count 2 was thin. However, based on the evidence presented and giving the benefit of every reasonable inference to the jury's verdict, the jury could have found Knight guilty pursuant to the theory that

he aided and abetted Barber in committing bankruptcy fraud in violation of 18 U.S.C. § 152(7).

Agent Steve Williams testified that, based on his investigation, fourteen judgments totaling over $30,000,000 were entered against Barber between May of 2008 and July of 2009. Most were consent judgments. Other evidence and testimony revealed that Barber and his entities were in poor financial condition. Specifically, Knight, in negotiating a debt Barber owed to Legacy Bank as personal guarantor on the Legacy building property, represented that Barber would likely have to file personal bankruptcy if he could not work out a deal with Legacy Bank. While this may simply have been strategic posturing, the inference can be made that Knight knew that Barber was looking at filing for personal bankruptcy if and when negotiations with Legacy Bank fell through, especially in light of the myriad of other lawsuits Barber and his entities were facing.

The evidence also tended to show that Barber was aware of the possibility of filing for personal bankruptcy throughout 2008. Stacey McSpadden testified that Barber was wanting to do real estate deals in 2008 to work out his financial problems and avoid personal bankruptcy. Brandon Rains testified that both the Lynnkohn bankruptcy and the possibility of Barber's personal bankruptcy were discussed in early 2008. Rains testified that these discussions involved Knight and were about the general possibility that Barber may at some point have to file for bankruptcy. Seth Kaffka, who had an interest in Lynnkohn along with Barber, testified that the Lynnkohn bankruptcy was part of a strategy to stave off personal bankruptcy for both himself and Barber and to possibly get a deal done with Legacy Bank. Kaffka testified to having conversations about this strategy with Knight. John Bracey testified that Barber was always hopeful that he could avoid personal bankruptcy but that it was clear to Bracey that because of pressure from creditors, Barber was going to have to file for bankruptcy to protect himself. Barber hired Knight in early 2008 specifically to

help him with his financial and legal problems.  Although the connection to Barber's personal bankruptcy filing and the transfers of monies through Knight's trust account is speculative and circumstantial, given the totality of the circumstances, the inference could be made that Barber and Knight took certain actions with the view that Barber would eventually be filing for bankruptcy.

At one point, Knight told Barber that he assumed that Barber was going to wire money into Knight's trust account to pay Epsilon and EIA's interest payment share for Ballpark "so that First Federal and others do not know Barber is paying the money." (Gov't Ex. 71).  Barber ended up writing Knight a check to his trust account, and Knight wrote two checks to Outfield from his trust account to pay the interest owed by Epsilon and EIA.  This is at least circumstantial evidence to support a finding that Knight was knowingly and intentionally allowing Barber to use his trust account to hide money from potential creditors.

The evidence at trial tended to show that Knight assisted Barber in what was a fairly obvious attempt to keep money out of any personal bank account of Barber's unless and until absolutely necessary.  (*See, e.g.*, Def. Exs. 71, 139).  While this, in and of itself, is not illegal, when viewed in the context of Barber's financial circumstances and the temporal proximity to Barber's eventual bankruptcy filing (taking into account the relevant bankruptcy disclosure time periods), the jury could infer from the evidence an intent to defeat the provisions of the federal bankruptcy laws. Taking all of the evidence together and making numerous inferences in favor of the verdict, the Court finds that the evidence submitted by the Government was sufficient to support the jury's verdict of guilty as to Count 2 under a theory of aiding and abetting bankruptcy fraud.  The evidence was legally sufficient to support the theory that Barber did intend to conceal money from his bankruptcy creditors; that Knight knew of Barber's intentions to conceal his money in contemplation

of bankruptcy and with the intent to defraud; that Knight knowingly allowed Barber to pass funds through his trust account in order to aid and abet Barber in committing bankruptcy fraud; and that Knight intended that the offense be committed.  For the above reasons, the Court finds that Knight's motion for judgment of acquittal as to Count 2 should be denied.

      **ii.**      **Motion for New Trial**

      **a.**      **"Contemplation of Bankruptcy"**

The main dispute between the parties regarding Count 2 is the meaning of the phrase "in contemplation of bankruptcy."[32]  If Knight did not act "in contemplation of bankruptcy," as he argues in his motion, then he would not be guilty of bankruptcy fraud as charged in Count 2.

Knight contends that the Government's theory of the case rested on too broad an interpretation of "in contemplation of bankruptcy," and that viewed under the correct narrow reading of the phrase, Knight did not act "in contemplation of bankruptcy" as required by 18 U.S.C. § 152(7).  The Government asserts that "in contemplation of bankruptcy" should appropriately be construed broadly based on a plain, common-sense understanding of the meaning of "contemplation."

The Government argues that Knight waived any objection to the Court not giving a definition for "in contemplation of" bankruptcy in the final instructions given to the jury.  The Government's argument as to this issue, however, misses the point that Knight, in his motion, is not objecting to the Court's jury instruction.  Rather, Knight contends that the Government's case was premised on a misunderstanding and misapplication of the law and that, when the evidence is viewed under the

---

[32] The Court recognizes that the statute uses the language "in contemplation of a case under title 11."  For ease of reference, the Court will use phrase "in contemplation of bankruptcy."

correct legal standard, the Court should find that Knight is entitled to a judgment of acquittal or a new trial. Knight is not arguing that the Court made any specific legal error for which the Court would apply a plain error standard of review absent objection—the standard the Government argues should apply. Rather, the standard for a new trial on the grounds advocated by Knight is set forth in Rule 33 and relevant case law interpreting that Rule.

The Government asserts that where a term in the jury instructions is not defined, it must necessarily be left to the province of the jury to construe the term according to its plain language, allowing each side to argue their own version of the disputed phrase's legal significance. The Court does not agree that this is true in every case. Rather, it is the province of the Court to ensure that the law is correctly and justly applied in each case. While a supplemental instruction further clarifying or defining "in contemplation of bankruptcy" might have been helpful in this case, the Court does not believe that the instruction as to Count 2 was legally deficient. For the reasons set forth below, the Court finds that the instructions appropriately required the jury to find that Knight committed a proscribed act "in contemplation of bankruptcy" and with an intent to defraud.

Pursuant to its theory that "contemplation of bankruptcy" should be construed broadly, the Government argued at trial that Knight had contemplated that Barber would file for personal bankruptcy because (1) Knight and Barber had discussed the possibility of Barber having to file for personal bankruptcy, and (2) it should have been obvious based on Barber's financial situation in 2008 and early 2009 that he would have to file for personal bankruptcy. In closing, the Government argued that Knight knew in early 2008 that Barber was contemplating bankruptcy—that by virtue of Barber saying he did not want to file for bankruptcy, by definition that meant that he was talking about it. The Government argued that "contemplate" simply means to think about, such that "when

you hire a bankruptcy attorney and you go in and talk to them about how you've got a bunch of debts you can't pay, you're contemplating bankruptcy." Therefore, since Barber hired Knight in January of 2008 and thereafter had some conversation with Knight about debt and bankruptcy, "everything that went into Knight's account after that time was concealed in contemplation of bankruptcy."

Knight argues that the Government's argument and presentation of evidence throughout the case, culminating in its closing, resulted in the Government providing a legally incorrect definition of "in contemplation of bankruptcy" to the jury. In response, the Government argues that "[t]he Defendant's contention that Government's closing argument presented a definition of 'in contemplation of bankruptcy' is misleading." (Doc. 191, p. 5). The Government argues that its "closing argument properly stated to the jury that the evidence presented to them demonstrated that Barber and Knight contemplated bankruptcy by discussing whether or not Barber should file for bankruptcy as Barber could not pay his debts during this time period and would be forced to file for bankruptcy eventually." *Id.* at pp. 5-6. The Government argued to the jury that the defense wanted to change the law and the defense was trying to mislead the jury. However, it is the Government's position and argument that the Court finds most untenable.

The phrase "in contemplation of bankruptcy" must be narrowly construed. In the civil context, the Supreme Court has rejected the notion that "in contemplation of" bankruptcy "encompasses any advice given to a debtor with the awareness that he might soon file for bankruptcy, even if the advice seeks to obviate the need to file." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 240 (2010). In *Milavetz*, the Supreme Court recognized that historical "[u]se of the phrase ['contemplation of bankruptcy'] by Members of Congress illustrates [a] traditional coupling" of the thought of declaring bankruptcy with "'action designed to thwart the

distribution of assets in a bankruptcy proceeding.'"  *Id*. at 240-41 (quoting Black's Law Dictionary (8th ed. 2004).  The Supreme Court viewed the subsection of the civil, bankruptcy-code statute at issue in that case (11 U.S.C. § 526(a)(4)) in the context of other sections of the bankruptcy code. *Id*. at 243.  In the end, the Supreme Court held that the "controlling question" as to whether a person acted "in contemplation of" bankruptcy for purposes of 11 U.S.C. § 526(a)(4) was "whether the impelling reason for advising an assisted person to incur more debt was the prospect of filing for bankruptcy." *Id*. (internal quotation omitted).  The Supreme Court concluded that "the language of the statute, together with other evidence of its purpose, makes [a] narrow reading of § 526(a)(4) not merely a plausible interpretation but the more natural one" and held that the statute is violated "only when the impetus of the" act proscribed by the statute at issue, advice to incur more debt, "is the expectation of filing for bankruptcy and obtaining the attendant relief."  *Id*. at 248; *see also Brown v. Luker*, 277 F.3d 1041, 1045 (8th Cir. 2002) ( also in the civil context, in construing a different bankruptcy statute regarding determining reasonableness of pre-petition attorney's fees, stating that "'[i]n contemplation of' generally denotes that the impelling cause of the transaction is influenced by the possibility or imminence of a bankruptcy proceeding" (quotation omitted)).

The Government argues that the *Milavetz* case is distinguishable in that it was a civil case, and the Supreme Court was construing a civil statute.  The Government presents no argument, however, as to why the Supreme Court's reasoning should not apply—at least as persuasive authority—to the criminal statute at issue in this case.  Indeed, it would seem that the Supreme Court's reasoning in *Milavetz* would, in large part, apply even more forcefully to the interpretation of "in contemplation of" in the criminal context to avoid questions of constitutionality and broadly imposing criminal liability to actions out of line with the statute's overall intent and purpose.

-47-

To construe the phrase as broadly as the Government advocates would undoubtedly have a chilling effect on the ability of attorneys to effectively advise clients in precarious financial situations.  An attorney should not be made to assume that, because bankruptcy is always a potential option to those facing financial hardships, any action taken or advice given to a client may be viewed as having been done "in contemplation of" their client's potential bankruptcy.  Such an interpretation would also potentially prejudice the ability of persons facing financial hardships from being able to seek legal advice.  If all that is required under 18 U.S.C. § 152(7) for "contemplation of bankruptcy" is a prior conversation about the possibility of bankruptcy or the desire to avoid it, then attorneys would be effectively chilled from ever taking money from a client with whom he or she has discussed bankruptcy, even in the most general terms.  As the Supreme Court stated in the civil context, "the inhibition of frank discussion serves no conceivable purpose within the statutory scheme."  *Milavetz*, 559 U.S. at 246.

The Government cites to *United States v. Yielding*, 657 F.3d 688, 714 (8th Cir. 2011) *cert. denied*, 132 S. Ct. 1777 (2012), for the proposition that "in contemplation" should be broadly construed as pertaining to a "matter that was not yet pending but which the Defendant envisioned or anticipated."  In the Court's view, *Yielding* does not support the Government's position.  The obstruction-of-justice statute at issue in *Yielding* provides that whoever commits the proscribed acts outlined in the statute "with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under Title 11, or in relation to or contemplation of any such matter or case" shall be penalized as provided.  18 U.S.C. § 1519.  Critically, the *Yielding* opinion states that "[a]lthough the phrasing of the statute is a bit awkward, the government concedes that the prosecution must show

-48-

intent to impede, obstruct, or influence the investigation or proper administration of a matter"
whether a defendant acted (1) directly with respect to a pending matter, (2) in contemplation of any
such matter, or (3) in relation any such matter.  657 F.3d at 711.  The opinion construed the "in
contemplation" phrase of the statute as merely expanding the scope of the statute to include acts done
in contemplation of future matters not yet pending.  *Id*.  The *Yielding* court then goes on to explain:

> [W]e do not think Congress, in expanding the scope of section 1519 beyond actions
> directed to a pending matter, eliminated the need for proof of intent to impede,
> obstruct, or influence a federal matter.  In other words, the statute does not impose
> liability for 'knowingly . . . destroy[ing] . . . any . . . document . . . in . . .
> contemplation of any [federal] matter,' *without* an intent to impede, obstruct, or
> influence a matter.  If it did, then the statute would forbid innocent conduct such as
> routine destruction of documents that a person consciously and in good faith
> determines are irrelevant to a foreseeable federal matter.

*Id*.  The proposed definition of "in contemplation of" quoted by the Government was made in this
context—in which the Eighth Circuit specifically found that an element of intent is still required and
"in contemplation of" merely means that the statute prohibits acts taken when there is not a presently
pending federal matter.  The *Yielding* opinion does not speak to whether "contemplation" must also
be the impelling cause of the act proscribed by the criminal statute at issue in that case.

The legislative history of the statute at issue in *Yielding* indicates that the statute at issue in
that case was meant to apply broadly.  657 F.3d at 714 (citing S. Rep. No. 107-146, at 14 (2002)).
In contrast, the legislative history for the bankruptcy fraud statute at issue indicates a desire that the
statute not overreach in its application to cover acts not falling under its narrow umbrella.  *See, e.g.*,
140 Cong. Rec. S14597-02 (1994) (daily ed. Oct. 7, 1994) (statement of Sen. Howard M.
Metzenbaum) (while the bankruptcy fraud statute "is tough on white collar crime, it does not
overreach in its applications.  Proof beyond a reasonable doubt of a specific intent to defraud is

required, persons committing an alleged fraudulent act for a lawful purpose are not covered, and any act, to be deemed criminal, must be a part of a scheme to defraud involving a bankruptcy proceeding."). Furthermore, read in context with the other subsections of 18 U.S.C. § 152, subsection 7 should be read to prohibit acts meant to be subversive to the bankruptcy code, not acts that are done—even criminal acts—in tenuous connection with the possibility of a bankruptcy being filed. *See Milavetz*, 559 U.S. 229 (construing meaning of "in contemplation of" in 11 U.S.C. § 526(a)(4) in context of bankruptcy code).

The bankruptcy fraud statute, 18 U.S.C. § 152, has nine subsections, with each subsection setting forth a different criminal act. The relevant subsection for Count 2 is 18 U.S.C. § 152(7), which provides that:

> A person who . . . in a personal capacity or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property or the property of such other person or corporation . . . shall be fined under this title, imprisoned not more than 5 years, or both.

By requiring that a person "knowingly and fraudulent transfer[] or conceal[]" property "in contemplation of a case under Title 11," the language of the statute itself requires that the proscribed actions of transferring or concealing property be linked to the contemplation of bankruptcy at the time the proscribed act occurs. A person does not act "in contemplation of" bankruptcy by virtue of the fact that he has a conversation about bankruptcy and then sometime later transfers or conceals property, having already put that conversation or any other thought of bankruptcy out of his mind.

Furthermore, adopting an overly broad construction of "in contemplation of" bankruptcy in the context of 18 U.S.C. § 152(7) would potentially cause criminal liability to be imposed based on

-50-

otherwise innocent acts simply because the acts occurred after the possibility of bankruptcy had been raised.  For example, a person might knowingly transfer a potential bankruptcy debtor's property with innocent mind and purpose, and the transfer might, in fact, be fraudulent.  On its face, the bankruptcy fraud statute then only requires that the knowing and fraudulent transfer be done "in contemplation of" bankruptcy.  To read "in contemplation of" so broadly that only a simple conversation about the possibility of bankruptcy would suffice to bring all subsequent acts under the contemplation umbrella would result in the bankruptcy fraud statute criminalizing the otherwise innocent transfer of the example.  The Court cannot construe the statute in a way that would allow for such an absurd result.  Rather, the Court finds that the statute must be read in line with *Milavetz*, such that the "contemplation of bankruptcy" must be the impelling cause of the transfer or concealment at issue.

    This finding is supported by the fact that the bankruptcy fraud statute was not meant to penalize fraud generally.  Instead, it was meant to curtail abuse of the federal bankruptcy process.  The intent and purpose of 18 U.S.C. § 152 is to keep people from "attempting to defeat the intent and effect of the bankruptcy law through any type of effort to keep assets from being equitably distributed among creditors." *United States v. Novak*, 217 F.3d 566, 575 (8th Cir. 2000) (quotations omitted).  It is the connection to the federal bankruptcy process that confers jurisdiction on the federal courts.  The Supreme Court has cautioned that "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance in the prosecution of crimes." *Jones v. United States*, 529 U.S. 848, 858 (2000) (internal quotation omitted).  More recently, the Supreme Court has reiterated that criminal statutes "must be read consistent with principles of federalism inherent in our constitutional structure." *Bond v. United States*, 2014 WL

2440534, at *8 (U.S. June 2, 2014).  After reviewing "clear" Supreme Court precedent, the Court in *Bond* rejected the government's broad reading of a criminal statute, citing "the deeply serious consequences of adopting such a boundless reading [] and the lack of any apparent need to do so in light of the context in which the statute arose." *Id*. at *11.  The *Bond* Court concluded that "we can insist on a clear indication that Congress meant to reach purely local crimes, before interpreting the statute's expansive language in a way that intrudes on the police power of the States." *Id*.  As in both *Jones* and *Bond*, to accept the Government's proposed broad reading of the statute at issue in this case, 18 U.S.C. § 152(7), as encompassing general fraud crimes that take place after a simple discussion of bankruptcy, would intrude on the police power of states to prosecute general fraud crimes.  Assuming that Knight and Barber acted with the intent to hide money from creditors generally does not lead to the inevitable conclusion that they acted with the intent to hide money from eventual *bankruptcy* creditors.  The need to prevent federal bankruptcy fraud does not require the Government to police any and all potentially fraudulent actions taken after a person has had a discussion about bankruptcy.

The Court finds that the evidence presented at this trial preponderated against a finding that the "contemplation of bankruptcy" was the impelling cause in Knight allowing Barber to transfer funds through Knight's trust account.

The Government presented evidence that transfers of money through Knight's trust account were made close in time to Barber's bankruptcy filing.  The timing of alleged fraudulent transfers relative to an eventual bankruptcy filing is relevant only to the extent that it can serve as circumstantial evidence of a defendant's *mens rea*.  But temporal proximity to a bankruptcy filing cannot be dispositive without other evidence showing that the defendant acted "in contemplation of"

a bankruptcy proceeding.  In this case, the timing of the transfers at issue was not so suspicious as to constitute convincing circumstantial evidence of the requisite contemplation of bankruptcy. The last transfer of Barber's funds out of Knight's trust account was made six months prior to Barber filing for bankruptcy.  Other transfers were made starting more than one year before Barber filed for bankruptcy.

The Government argued that Knight knew that Barber was eventually going to have to file for bankruptcy and that the transfers into and out of his trust account were structured to hide money from Barber's creditors.  The Government's theory, as summarized in its closing, was that Barber and Knight had discussed bankruptcy in early 2008 and that Barber was in a precarious financial position in 2008 and 2009.  Therefore, according to the Government, Barber and Knight had contemplated bankruptcy by at least February of 2008.  In its response to Knight's motion, the Government states that "[t]he trial record is replete with evidence that the Defendant and Brandon Barber contemplated bankruptcy over a year in advance of filing Barber's bankruptcy petition in July 2009." (Doc. 191, p. 7).  The Government, however, cited to only three emails[33] in support of its position.  All of these emails were sent in the context and time period of the Lynnkohn bankruptcy and were largely in the context of Knight negotiating on Barber's behalf.  An attorney should be able to freely negotiate on his client's behalf without being inhibited by the fear that issues raised during such negotiations might later expose him to criminal liability.

The testimony regarding whether and when Knight might have contemplated Barber's personal bankruptcy was far from compelling and did not link the contemplation of bankruptcy to

---

[33] The Government did not include exhibit numbers for the referenced emails.  The Court nevertheless, in its review of the admitted exhibits, believes it was able to determine which exhibits the Government was referring to.

the actual transfer or concealment of Barber's funds.  Much of the testimony indicated that, when Barber was discussing personal bankruptcy in 2008 and early 2009, the discussion was about trying to avoid bankruptcy.  Agent Williams testified that Barber stated in interviews with investigators that he had no intention of filing for personal bankruptcy until the week before he actually filed.  The evidence tended to preponderate towards the conclusion that Barber was actively trying to structure deals to work his way out of debt.  It is hard for the Court to view the evidence as supporting a finding that Knight concealed or transferred money through his trust account in contemplation of Barber's bankruptcy when it appears that even Barber himself structured these transactions in an attempt (although perhaps misguided) to work his way out of debt and to *avoid* bankruptcy.  All in all, while the Government's evidence may have supported the notion that Barber and Knight had contemplated bankruptcy as of early 2008 in the broadest sense of the word "contemplation," the evidence preponderated against a finding that the contemplation of Barber's bankruptcy was the impelling cause in Knight transferring Barber's money through his trust account.

For all of the above reasons, the Court finds that the evidence  preponderates sufficiently heavily against a finding that Knight contemplated Barber's personal bankruptcy filing in connection with the transfer of Barber's funds through his trust account such that a serious miscarriage of justice will occur if the Court does not grant Knight a new trial as to Count 2.  Because a conviction based on aiding and abetting must likewise be premised on a finding that the transfer of funds through Knight's trust account was done in contemplation of bankruptcy, the Court finds that a new trial should be granted even when considering that Knight's conviction may have been based on a theory of aiding and abetting.

### b.    Intent to Defraud

A plain reading of the language of 18 U.S.C. § 152(7) indicates that the act proscribed—the knowing and fraudulent transfer—must be done *either* (1) "in contemplation of a case under title 11" *or* (2) "with intent to defeat the provisions of title 11." 18 U.S.C. § 152(7). The statute then requires that the person both "knowingly" and "fraudulently" transfer or conceal property. The language of the statute can be fairly read as only requiring that the transfer or concealment of property *be* fraudulent. Based on its plain language, the statute does not necessarily require that a person act with the *intent* to defraud. As stated above, the *Yielding* opinion stands for the proposition that criminal statutes should not be construed in a way that would allow criminal liability to be imposed without some element of intent, even where, as here, the statute does not—based on a purely grammatical reading—appear to require such an element of intent. That principle should be applied to an analysis of 18 U.S.C. § 152(7) such that the statute should be read to require an intent to defraud, even in cases charged under the "contemplation of bankruptcy" clause.

The Court finds that Knight's motion for a new trial should be granted as to Count 2 on the alternative grounds that the evidence presented at trial preponderated sufficiently heavily against a finding that Knight possessed an intent to defraud in relation to allowing Barber to pass funds through his trust account. As evidence of fraudulent intent, the Government presented testimony and documentary evidence regarding Knight's use of his trust account; Knight's involvement in the Ballpark, Spring Creek, and Executive Plaza real estate transactions; false disclosure and non-disclosures in relation to the Legacy Bank proceeding and Barber's personal bankruptcy filing; Barber's use of the entity NWARE; and Knight's receipt of attorney's fees for his representation of Barber. The Court will discuss each of these areas of evidence in turn.

### 1.    Use of Trust Account

Between April 2008 and January 2009, approximately $1,200,000 was transferred through Knight's trust account on Barber's behalf. A lot of argument and testimony was presented at trial as to whether a lawyer's trust account was a good hiding spot to keep money from creditors or whether a lawyer's trust account is subject to garnishment. This testimony was all largely irrelevant except to the extent that it could have shed light on the mindset of Knight in allowing Barber's money to be transferred into or out of the trust account. The important consideration is not whether, in hindsight, Barber or Knight actually kept money from bankruptcy creditors through their use of the trust account. Rather, it is whether, at the time the transfers were made, Knight allowed those transfers with the requisite intent to defraud and in contemplation of Barber's eventual bankruptcy.

As to the handling of the trust account generally, attorney John Everett testified as an expert on behalf of Knight, and attorney Rex Terry testified for the Government. Everett stated that based on his review of the transactions at issue in this case, Knight handled his trust account appropriately and in line with the Rules of Professional Conduct. Everett did testify that there are certainly some limitations on an attorney's use of a trust account. For instance, Everett testified that a lawyer cannot assist a client in committing fraud; however, that rule presupposes that the lawyer knows about the fraud. Everett testified that there is no requirement, however, for a lawyer to refuse to accept money from a client into his trust account when the client has outstanding judgments against him. Everett also stated that it was not uncommon for lawyers' trust accounts to get garnished in northwest Arkansas and that, in his opinion, a trust account would be a very poor place to try to hide money.

Terry, on the other hand, opined that Knight's conduct in handling his trust account was "egregious." Terry testified that he had never seen anything like Knight's handling of Barber's funds in his trust account. He stated that he certainly thought it was possible to conceal money in a trust

account, as he believed it was done by Knight.  Terry testified that, even if Knight's actions did not technically violate any specific rule regarding a lawyer's use of a trust account, that not everything was in the rules and that lawyers have a general obligation to avoid even the appearance of impropriety.  Neither Everett nor Terry testified as a fact witness, and therefore neither expert could testify as to Knight's mindset in transferring any funds into or out of the trust account.

While there was a lot of testimony as to the use of Knight's trust account, it was unclear whether the issue was transfers into, out of, or simply through Knight's trust account.  Count 2 charges Knight with "knowingly and fraudulently transferr[ing] monies . . . *into* Knight's IOLTA account, thereby concealing it from Barber's creditors and the Bankruptcy Court."  (Doc. 157, ¶ 20) (emphasis added).  Furthermore, the money laundering counts charge Knight with transferring funds representing the proceeds of bankruptcy fraud out of his trust account.  The theory behind the money laundering counts, therefore, must be that money in the trust account became proceeds of bankruptcy fraud at the time that the money was transferred *into* the account.  If transfers out of the account were at issue, a question would arise as to whether the money laundering counts merge with the substantive offense of bankruptcy fraud.  *See United States v. Rubashkin*, 655 F.3d 849 (8th Cir. 2011) (considering merger in money laundering cases and looking at whether predicate offense was complete before charged money laundering transaction was made in determining whether there was a merger problem).

Agent David Kimbrough, however, testified that he thought all transfers through the trust account should have been disclosed in Barber's personal bankruptcy.  Agent Steve Williams also testified that he thought transfers through Knight's trust account should have been disclosed in both the Legacy Bank foreclosure proceeding and in Barber's personal bankruptcy.  John Terry Lee, the

bankruptcy trustee, testified that it was the transfers *out of* the trust account that were the problem, as those transfers were what should have been disclosed in bankruptcy.  Lee testified that the transfers into the trust account would not have to be disclosed in bankruptcy.  Jill Jacoway, the Government's bankruptcy expert, testified that she thought both transfers into and out of the trust account should have been disclosed in Barber's bankruptcy.

If the transfers out of the account are at issue, the case becomes complicated by the fact that various witnesses testified that the attorney managing a trust account generally is obligated to safeguard his client's funds and disburse those funds at the direction of the client.  John Everett, for instance, testified that the client—not the lawyer—owns the funds in a trust account and that the lawyer cannot independently exercise control over the client's funds.  Everett further testified that, in his opinion, a lawyer would actually have an obligation not to go to his client's creditors to independently make them aware of money in a trust account unless and until he were served with a writ of garnishment or had some other legal obligation to disclose the funds.  The evidence in this case showed that Knight did in fact act at Barber's direction or at the direction of Christy Bennett in disbursing Barber's funds from his trust account.

As to transfers into the account, Everett testified that a lawyer does not have a general obligation to ask a client about the source of the funds paid into a trust account.  However, both Everett and Terry testified that an attorney cannot knowingly allow a client to use a trust account to perpetrate a fraud.  In any event, the obligations of a lawyer under the Rules of Professional Conduct are relevant to the extent that a proven violation may be probative of knowledge or intent to commit a criminal act.  The underlying consideration remains whether Knight acted with an intent to defraud.  Even if Terry's testimony is correct that Knight acted in violation of the letter or spirit of the Rules

of Professional Conduct in allowing Barber to us his trust account in an unusual manner to conceal money from creditors, the Court is mindful, here as in the context of Count 1, that merely putting money beyond the reach of creditors is not enough to find a criminal intent to defraud, as the intent to keep value away from creditors is not automatically impermissible. *In re Addison*, 540 F.3d at 814-15.

The three real estate transactions discussed in depth in the facts section above were the primary source of the majority of funds placed into Knight's trust account. Apart from the monies that Knight received into his trust account stemming from those real estate transactions, which will be discussed separately below, on April 2, 2008, Knight received a total of $52,932.31 from 14 cashier's checks resulting from First State Bank force-closing accounts for Barber and his entities. Knight testified that he met with Barber and Bennett on the day Barber's accounts were closed. Knight stated that the two were in a panic about the accounts being closed and needing to get payroll checks sent out. Knight testified that Barber also told him he was late for a flight to New York, did not have time to open another account that day, and did not have another account available in which to put the money. Barber asked Knight if Knight could put the money into his trust account. Knight agreed to do so. Stacy McSpadden testified that Barber was having trouble keeping a bank account in 2008 and that Christy Bennett was stressed about going to banks to try to open accounts for Barber and being denied. Bennett testified that at the time First State Bank closed those accounts, Barber did not have any other business checking account to use to pay his immediate business expenses. Agent Williams testified that, according to his investigation, Barber did not have another personal bank account open at the time First State Bank closed his accounts on April 2, 2008. Barber Group did, however, open a new account the next week. The Government implied that Knight should have

then transferred Barber's money to the new account.  However, no evidence was presented to show that Barber directed Knight to disburse Barber's money in that way.  This money was put into Knight's trust account more than one year before Barber filed for personal bankruptcy, and no extrinsic evidence was presented as to an intent by Knight to defraud by accepting this money.  Nor was any particularly convincing evidence presented that Knight had knowledge of any fraudulent scheme by Barber when he accepted the money into his account.

## 2.    Real Estate Transactions

Approximately $1,193,000 that passed through Knight's trust account originated with the three major real estate transactions: $688,000 from Ballpark, $191,000 from Spring Creek, and $314,000 from Executive Plaza.  A large portion of the evidence presented at trial was related to those real estate transactions.  For this reason, and because there is some marginal relevance to the charges against Knight, the Court will discuss each transaction in turn.  However, having reviewed the totality of the evidence, it is difficult for the Court to find that the specifics of these transactions are particularly relevant to the charges against Knight.  The evidence presented at this trial indicated that Knight played a limited role in these transactions, and the evidence was not conclusive that any banks were defrauded.  Furthermore, Knight was not on trial for bank fraud.  While the transactions were the source of most of the money that Barber put into Knight's trust account, the evidence that Knight accepted the money into his account in order to hide it from creditors or with fraudulent intent was weak at best.  In fact, the evidence tended to show that Barber was attempting to use these and other proposed negotiated deals to solve his financial problems and work his way out of debt by generating cash to pay off creditors.  These transactions are relevant only to the extent that they might tend to show that Knight accepted money into his account with fraudulent intent—whether

-60-

the intent was to commit bank fraud, assist Barber in defrauding his creditors, or perpetrate some other fraud.  The evidence of Knight's intent to defraud as to each real estate transaction will be discussed in turn.

•   <strong>Ballpark</strong>

While the Government implied throughout the trial that the Ballpark transaction was itself fraudulent, there was a lack of evidence presented at this trial to show that bank fraud occurred.  No one from First Federal testified as to a lack of knowledge of what happened in the Ballpark transaction.  In fact, the loan approval form (Def. Ex. 132), in which First Federal approved the $3,200,000 loan to Outfield Development, indicates that First Federal knew of Barber's involvement in the deal, as an entity owned at least in part by Barber (Dream Team Holdings, LLC) was listed as a limited guarantor for the loan.  *Id*.  Property owned by Dream Team Holdings, LLC ("Dream Team") was used as extra collateral in securing the loan.  *Id*.  The loan documents show that Dream Team was obligated on other loans to First Federal, such that First Federal would have had prior knowledge of Dream Team and its owners.  *Id*.  Furthermore, Van Doren testified that he was absolutely certain that First Federal would have known Barber was the owner of Dream Team.  First Federal's knowledge of Barber's involvement is also indicated by the fact that Epsilon bought Sloan Estates on the same day, and testimony by multiple witnesses indicated that First Federal was incentivized to do the Ballpark transaction loan to Gaddy's entity because they were getting one of Barber's bad debts off the books and onto a more credit-worthy entity, Epsilon.  In any event, the evidence presented at trial did not establish a lack of knowledge by First Federal as to the Ballpark

transaction sufficient to draw any definitive conclusion that the transaction was itself fraudulent.[34] Even if Barber had wished to hide his involvement in the Ballpark transaction or the other two deals, there is nothing inherently criminal about Barber hiding his involvement as long as the lending institution has the relevant financial information it needs to make an informed decision as to whether to issue a loan.

As to Knight's involvement in the Ballpark transaction, Knight testified that he was asked to prepare a simple real estate contract for a direct sale from the Rigginses to Epsilon. Ken Hall testified that although Knight had done that preliminary sales contract, the contract was not used, and Knight did not work on the Ballpark transaction itself. John Bracey, who worked for Barber at the time of the Ballpark transaction, testified that he wanted Hall to be the "keeper of the keys" on the Ballpark deal because he had a better comfort level with Hall. Hall testified that he formed EIA to be the middle man in the transaction; Hall drafted the contracts of sale between Lindsey's entity and EIA and between EIA and Gaddy's entity; and Hall drafted the escrow agreement (with only non-substantive changes made later by Knight at Van Doren's suggestion and with Barber's agreement).

The evidence and testimony presented at trial showed that Barber worked directly with Donna Stewart in drafting the HUD settlement sheet for the Ballpark transaction. Hall was the attorney who reviewed the HUD sheets sent by Stewart prior to the closing. (Def. Ex. 130). Up until the morning of the closing, Stewart communicated with Barber and Hall about the HUD sheets, and

---

[34] Having reviewed the evidence, the Court finds it curious that Ross Mailloux signed as the approving loan officer on behalf of First Federal on March 28, 2008. Although the loan application indicated that executive loan committee approval was required, it appears that the executive loan committee members did not sign their approval until April 8, 2008—after the Ballpark closing and after funds had already been disbursed. In any event, it appears that Mailloux at the very least knew the relevant details of and parties involved in the transaction and that the executive loan committee did—at least belatedly—affirm its approval of the loan.

Knight was not copied on those emails.  (Def. Exs. 129-130).  Hall had previously suggested not

letting the banks know that money was being escrowed and instead just listing a payoff to Epsilon

and keeping the escrow agreement between EIA and Epsilon.  (Def. Ex. 16; Gov't Ex. 28).  Just four

days before closing, Hall suggested that Knight serve as the escrow agent for the $688,000 to be

escrowed pursuant to the escrow agreement between EIA and Epsilon.

      Even though it appears that Hall took the lead in drafting the documents to structure this

transaction, Hall testified that he was confused about certain aspects of the deal.  Hall testified that

on the Friday before the Monday closing he decided that he just did not feel comfortable handling

the closing.  As an example, he mentioned that he was not sure about the HUD listing a payoff to

Epsilon.  The documentary evidence, however, shows that Hall was the one who suggested listing

a payoff and that he did not believe the bank needed to know about the escrow agreement.  (Def. Ex.

16; Gov't Ex. 28).  Hall also was the one who reviewed and, with Barber, approved the HUD

statements sent by Donna Stewart.  An original draft sent by Stewart to Hall and Barber actually

listed "escrow funds" care of Knight Law Firm instead of "payoff to Epsilon."  (Def. Ex. 130).  Hall

admitted at trial that his use of the words "payoff to Epsilon" may have contributed to the ultimate

use of those words on the HUD settlement sheet.

      Hall said he also became concerned after receiving an email from Brandon Rains stating that

the escrow account was to be used to "pass money through and back to us" (Gov't Ex. 7).  Knight

was not copied on this email.  Despite his concerns, Hall is the one who prepared the escrow

agreement and knew where the money would be going.  Hall testified that he did not mention any

of his concerns to Knight.  Instead, the afternoon before closing, Hall sent an email to First Federal

officers and Donna Stewart, with a copy to Barber,[35] stating that "[b]ecause I cannot provide a closing protection letter,[36] we decided it would be smoother to have Donna handle the closing." (Def. Ex. 29). Hall testified that the stated reason was just an excuse he came up with to give First Federal so that he could gracefully get out of doing the closing. In other words, Hall did not feel that his concerns were of a nature or character that he should share them with First Federal. Hall testified that he had no communication with Knight after he ceased representation of Barber shortly after the Ballpark deal.[37]

Stewart testified that the HUD settlement sheet was not a public document, and that whatever is listed on the HUD is between the buyer, the seller, the bank, and the closing agent. Stewart testified that the title company would not even release a copy of the HUD statement to anyone else who was not authorized to have it. Therefore, even had Knight been involved with the wording of the HUD statement, the potential for the "payoff to Epsilon" listing on the HUD statement to confuse creditors outside of First Federal was slim. Stewart also testified that, at closing, she sends copies of the deed and mortgage to all parties involved, including the lending institution. Barber clearly

---

[35] The fact that Hall sent this email to First Federal officials with Barber copied is further evidence that the bank was aware of Barber's involvement. The fact that Knight was not copied on this email is further evidence of the limited nature of Knight's involvement.

[36] "A closing protection letter offers reimbursement for loss in connection with misappropriation of closing funds and noncompliance with written closing instructions." (Def. Ex. 49). It is not clear whether a closing letter was actually issued in the Ballpark deal or, if one was issued, what party requested it. There was no evidence presented that First Federal used a closing letter as recourse for any perceived misappropriation of funds involved in the Ballpark transaction.

[37] Hall testified that he did not really represent Barber after this transaction because Barber owed him money and because—after having represented Barber for one-and-a-half to two years— Hall did not think Barber was being totally honest with him. Again, Hall testified that he did not share any of his concerns with Knight.

signed the deed on behalf of EIA, and the deed is and was a matter of public record.

The Court notes that Knight was also involved in the Ballpark transaction to the extent he exchanged some emails with an appraiser Barber thought would be appraising the property for First Federal.  (Gov't Exs. 65-67).  The Government argued that the emails showed that Barber was working with Knight to try to get an inflated appraisal value for the property.  While the emails might be construed in that manner, they might also be construed as Knight and Barber trying to figure out what the appraisal value was going to be.  Ultimately, the bank had the appraisal done by another appraiser who valued the property at less than what had been contemplated by Barber and Knight.  Nevertheless, the bank loaned Gaddy's entity the amount requested, knowing that it was more than what the property appraised for.

As to the amount to be escrowed, Van Doren testified that he did not know why so much money was put into the escrow account, because he certainly did not need that much money to feel secured on the Timber Trails property.  The documentary evidence, however, shows that Van Doren was the driving force behind the final amount put into escrow, even suggesting to Hall the Saturday evening before closing on Monday that more money should be escrowed.  (Def. Ex. 128).  There was no evidence presented that Knight asserted any influence over the parties either to serve as the escrow agent or in negotiating what amount of money should be placed in escrow.

Much of the confusion and investigation into the $688,000 seems to have stemmed from Van Doren's deposition during the AP in Barber's bankruptcy case, in which Van Doren claimed that he did not know what happened to the $688,000.  While it appears to the Court that Van Doren's deposition testimony regarding the $688,000 was misleading, the fact remains that the escrow agreements were provided to Marshall Ney, who had them in his possession both at the time of the

deposition and at the time of the AP proceeding.  It appears that the escrow agreements, which explain how the $688,000 was to be handled, were overlooked.  The $688,000 represents the largest single amount of money deposited into Knight's trust account with which the Government took issue.  The issue, however, seems to have been predicated on an initial misunderstanding of what those funds represented.  Having reviewed the evidence, the Court ultimately can find no issue with Knight's handling of the escrowed funds.

The documentary evidence tends to establish that Knight distributed the escrowed funds in accordance with the agreement and the understanding of the parties to the escrow agreement (Barber for EIA and Van Doren for Epsilon) and at the direction of those parties.  As of June 2008, Van Doren agreed to lower the amount in escrow to $30,000.  The Government presented some evidence that, at that time, there was not $30,000 left in the escrow account.  Even assuming that the Government's calculations are correct, the Court is not convinced that a lower amount in escrow would be particularly compelling evidence that Knight must have mishandled the escrowed funds and, therefore, have had an intent to defraud.  At no time did either party complain about the disbursements made out of the account.  Van Doren agreed that money could be released to EIA/Barber as the houses were sold, in the amount of the loans on the houses.  Apparently, the parties also assumed that there would then be enough left in the account to cover the amount of the loan debt on the fourth house until it sold.  These two understandings are simply not mathematically compatible given the other disbursements that the parties agreed would be made out of the account.  The account started with approximately $688,000, but was immediately reduced to about $566,000 after payouts to Van Doren and Epsilon of $32,000 and $90,664, respectively.  Assuming an average loan of about $150,000 on each of the Timber Trails lots, there was never going to be enough money

-66-

in the account to completely secure Epsilon for the loan on the fourth home to be sold.  This is especially true given the fact that the parties had agreed, and continued to agree at various points in time, that other funds would be paid out of the escrow funds.  Criminal intent cannot not be imputed as to Knight without some stronger showing that he acted inappropriately in regard to the escrowed funds.

Finally, as to the escrowed funds, the escrow agreement between the parties provides protection for Knight against civil liability.  The agreement states that the "Escrow Agent shall not be liable for any act performed by or pursuant to the terms of this agreement or during the term hereof unless such act is done in bad faith or Escrow Agent is negligent in the performance of his duties."  (Gov't Ex. 12).  Had the parties thought that Knight acted in bad faith or negligently in the performance of his duties as an escrow agent, they could have then filed a civil complaint.  It is hard for the Court to find that Knight should be held criminally liable for any acts surrounding his handling of the escrowed funds when he acted according to an agreement between two consenting parties, neither of whom complained that he acted inappropriately in regard to the funds.  This is especially true given that the evidence did not show that either party likely had a valid basis for complaining that Knight acted inappropriately in regard to the escrowed funds.  Knight accepted the role of escrow agent at the suggestion of a reputable lawyer from a reputable firm.  He accepted funds, as escrow agent, pursuant to an agreement signed by two consenting parties.  He then disbursed the funds in accordance with the agreement and at the direction of the parties.  The Court cannot find that the handling of the escrowed funds was evidence of an underlying intent to defraud or to conceal money from Barber's eventual bankruptcy creditors in a personal bankruptcy case that was filed over a year later.

- **Spring Creek**

Agent Williams testified that, since EIA sold the Spring Creek property to Gaddy's entity, Spring Creek Holdings, in the second part of the Spring Creek land flip, that the approximately $890,000 in net proceeds from the transaction should have gone to EIA.  Instead, the proceeds went to Barber personally (approximately $390,000) and Bob Gaddy (approximately $500,000).  There was no evidence presented, however, that Knight knew of this arrangement or orchestrated it in any way.  Donna Stewart was again the closing agent for the Spring Creek transaction.  Despite the fact that EIA was the intermediate seller, Stewart testified that Barber directed her to disburse funds to Barber personally and to Bob Gaddy instead of to EIA.  Stewart testified that, based on this direction from Barber, she did not issue a check to EIA.  Agent Kimbrough testified that, during his investigation of the case, he did not find any evidence to suggest that Knight prepared any of the contracts involved in the Spring Creek transaction.  The Court finds this absence of evidence to be telling given the amount of documentary evidence involved in this case and the apparent tendency of Knight, Barber, and others to use email as a regular means of communication throughout the relevant time period.

Knight later received $191,000 into his firm's business account via transfer from Barber's personal account at Citibank.  The evidence showed that the $191,000 could be traced to proceeds Barber received from the Spring Creek transaction.  Knight kept $40,000 in his business account as payment for fees and transferred the remaining $151,000 to his trust account to keep in trust for Barber.  There was no evidence presented to show that Knight knew the source of the funds was the Spring Creek transaction.  The money arrived in his account after having traveled through four different Citibank accounts held by Barber over a period of months.  Even had Knight known that

the source of the funds was the Spring Creek transaction, there was again no evidence presented to show that Knight was so involved in that transaction so as to know the mechanisms by which Barber generated cash to himself out of that deal. Knight testified that Barber had told him he was transferring the money because his Citibank accounts had been closed and that, at the time, Knight believed that. Again, as to this transaction, the Court cannot find that the Knight's acceptance of the $191,000 into his account was strong evidence of an underlying intent to defraud.

- **Executive Plaza**

There was no compelling evidence presented in this trial to substantiate any allegation or implication that any of the Executive Plaza transaction was fraudulent, except perhaps for the fact that Jeff Whorton testified that he pleaded guilty, in a separate case, of conspiracy to commit bank fraud based on his involvement in the Executive Plaza deal. Brandon Rains—a co-defendant with Whorton in the separate criminal case—testified, however, that he did not believe the Executive Plaza deal was fraudulent. Rains stated that he could not agree that the lending bank in the Executive Plaza deal did not know about him getting cash back from the deal.

As to the extent of Knight's involvement in the deal, Rains testified that an attorney named David Fisher drafted the agreements involved in the Executive Plaza transaction. Neither Jeff Whorton nor Marshawn Whorton, Jeff Whorton's wife and bookkeeper, ever had a conversation with Knight about the Executive Plaza transaction. Marshawn Whorton testified that she dealt only with Barber, and at Barber's direction in issuing the W-9 from Executive Plaza first to NWARE and then to Barber personally and in issuing the 1099 first to Barber personally and then to Barber Properties. Knight did look over title commitments prior to the Executive Plaza deal. The title commitments, however, would only have shown if liens on the property were correctly noted, they would not have

shown the intricacies or structure of the real estate transaction or any planned disbursement of funds. Donna Stewart testified that her title company regularly had Knight review deeds and title commitments for properties for which it did the closings.

Before the transaction took place on October 7, 2008, Knight also advised Barber on October 5, 2008 to set up a new entity to "receive payments from Whorton and Combs." (Gov't Ex. 74). NWARE was registered with the Arkansas Secretary of State the next day. Knight testified that Barber had told him that Whorton and Combs had agreed to pay him a finder's fee as a part of the Executive Plaza transaction. At the time the Executive Plaza closing took place, Knight was out of town to attend his father-in-law's funeral. Knight testified that when he returned to town Barber told him that Whorton and Combs had gone back on their deal to pay him the fee but that Barber was still trying to get Whorton to loan him $325,000.

On October 31, 2008, Barber forwarded Knight a string of emails in which Barber, Van Doren, and a lawyer out of New York discussed a meeting held in New York on the morning of the 31st—presumably regarding the anticipated Epsilon deal also involving Whorton. (Gov't Ex. 75). In one of the final emails, the New York attorney states that he will likely charge under $4,000 for the meeting. *Id*. Knight responds to the forwarding of the emails stating "1 percent . . . You ever get wire confirmation?" *Id*. Barber says "for some reason he only sent 314?" *Id*. Knight asks, "He tell you why?" *Id*. Barber responds, "Said he only had that much today and work w him." *Id*. From this email string it appears clear that at the very least Barber was not being entirely candid with Knight about the fact that the $314,000 from Whorton was the negotiated fee paid by Whorton as a part of the Executive Plaza transaction that had occurred three weeks prior to the wire being sent. At worst, it appears that Barber was attempting to lead Knight to believe that the $314,000 was sent

-70-

in relation to the anticipated Epsilon deal.  No payments were ultimately put directly into any account held by NWARE as a result of the Executive Plaza transaction.

As previously stated, in connection with the Executive Plaza transaction, the Government also presented evidence of Barber's sale of the Old Missouri office building to Jeff Whorton.  Again, the actual connection between the two transactions, apart from an oral agreement between Barber and Whorton, is unclear.  The evidence of Knight's involvement in the Old Missouri transaction was largely limited to the negotiation of Legacy Bank's third-priority lien in order to clear title to the property so that it could be sold.  Whorton testified that the lending bank knew he was getting cash out of the sale.  There was no compelling evidence of bank fraud or other fraud presented in relation to this real estate transaction.

The evidence presented at this trial as to the Executive Plaza transaction was not sufficient to find that the transaction was itself fraudulent.  Furthermore, the evidence presented preponderates against a finding that Knight was so involved in the transaction that he would have reasonably known of any fraudulent activity.  Finally, the evidence was inconclusive as to whether Knight knew that the $314,000 he ultimately received into his trust account was generated from the Executive Plaza transaction.  The Court cannot find that Knight's acceptance of the $314,000 into his trust account was strong evidence of an underlying intent to defraud.

### 3.    Alleged False Disclosures and Non-Disclosures

There was also a lot of evidence and testimony presented as to disclosures made by Barber, with Knight as his attorney, during both the post-judgment discovery process in the Legacy Bank foreclosure proceeding and during Barber's personal bankruptcy proceeding.  As with the evidence regarding Knight's use of his trust account, this disclosure evidence is relevant only to the extent that

it serves to shed some light on Knight's intent in making the earlier transfers.  Non-disclosures or false disclosures by Barber—or Knight on Barber's behalf—may be viewed as circumstantial evidence that Barber and/or Knight had an intent, at the time the funds passed through Knight's trust account, to conceal those funds.  The evidence was unclear, however, as to what precise disclosures were required and when.  Especially given this collective uncertainty, the evidence was underwhelming as to whether Knight made any false disclosures or omissions with an intent to defraud.  If Knight made false disclosures or omissions on Barber's behalf innocently, the mere fact of the false disclosures or omissions becomes irrelevant as to whether Knight acted with the requisite intent in allowing Barber to pass funds through his trust account.

It is important to note that the evidence showed that Knight was not the only person involved in gathering or compiling the information to respond to Legacy Bank or to be put on Barber's bankruptcy filings.  First and foremost, Knight had to rely on information provided by Barber himself.  Agent Kimbrough testified that Barber told agents during the investigative phase of this case that Knight advised Barber to disclose everything.  Such a statement, if made, would indicate that Knight was certainly not affirmatively advocating concealment or non-disclosure. Second, Christy Bennett testified that she was basically asked to do the heavy lifting in gathering information, based on Barber's records in her possession.  (Def. Ex. 166).  Third, Bennett's testimony and the documentary evidence reveal that Bennett worked mainly with Mason Wann and Lauren Pratchard in compiling information.  Bennett testified that she worked mainly with Wann and Pratchard in getting information together to respond to both the Legacy Bank interrogatories and the bankruptcy filings.  A bill sent by Knight to Barber for his firm's work in the bankruptcy (Gov't Ex. 76) indicates that Knight was not even involved in amending Barber's schedules the month before the

first significant amendment filed on October 31, 2009. It does not appear that Knight billed any time during that month for work on the bankruptcy schedules. *Id*. It appears that Pratchard billed for any time related to document preparation or collection related to gathering information for inclusion on Barber's bankruptcy filings. *Id*. The fact that Knight relied on information gathered in large part by his associates from Barber and his employees weakens any inference that false disclosures or non-disclosures must have been the result of an intent to defraud held by Knight personally.

- **Disclosures in Legacy Bank foreclosure action**

A deficiency judgment in the amount of $8,400,000 was entered against Barber and others in November of 2008 in the foreclosure action brought by Legacy Bank regarding the Legacy Building in Fayetteville, Arkansas. Much evidence and testimony was presented at trial regarding whether appropriate disclosures were made in response to Legacy Bank's post-judgment discovery requests served on Brandon Barber. Knight was Barber's attorney in the Legacy Bank action.

The evidence showed that Barber did not timely file an affidavit listing his assets within 45 days of the judgment as required. If a judgment debtor is not forthcoming with information, the judgment creditor may propound discovery and/or request that the court hold the judgment debtor in contempt. Legacy Bank first propounded discovery on Barber. When Barber delayed in giving full disclosures, Legacy Bank then requested that Barber be held in contempt. The state court ordered Barber to appear and show cause as to why he should not be held in contempt. Before the date of the hearing, Barber supplemented his disclosures to provide more information.

Regarding specific disclosures made by Barber, with Knight as his attorney, during the post-judgment discovery phase, Barber did disclose the existence of the NWARE checking account in his first response to the propounded discovery on February 23, 2009. (Def. Ex. 1, p. 4). Marshall Ney

testified, however, that Knight's trust account was not disclosed in response to an interrogatory asking Barber to list all accounts where he made deposits. At the time Barber's discovery responses were originally due on January 19, 2009, Barber did still have a small amount[38] of money in Knight's trust account. However, at the time the responses were actually sent on February 23, 2009, Barber had no money left in the trust account, nor were any additional deposits made after January of 2009. Ney testified that if he had known at some point that Barber had any money in Knight's trust account, he would have garnished it. While the delay in responding to Legacy Bank's discovery coupled with the timing of the emptying of the remaining funds in Knight's trust account may serve as circumstantial evidence of an intent to conceal, it serves more as evidence of intent to conceal money from an existing judgment creditor than as evidence of Knight's criminal intent in relation to accepting any money into his trust account in the first place. Furthermore, no evidence was presented as to the reason, if any, for the delay in Barber's filing of the responses from January 19 to February 23. The Court is unaware if Barber, or Knight on Barber's behalf, received an extension of time or if there may have been some other legitimate reason for the delay. Finally, no evidence was presented that Knight affirmatively counseled Barber to make or not make certain disclosures as to the foreclosure proceeding. The Court cannot find that the disclosures made in connection with the Legacy Bank foreclosure proceeding were strong evidence that Knight had an intent to defraud in accepting Barber's money into his trust account.

- **Disclosures in Bankruptcy**

Two competing experts testified in this case as to what is required to be disclosed in a

---

[38] Agent Williams testified that there was still $85,000 in Knight's trust account in January 2009. The evidence did not support this testimony. The Government did not otherwise legitimately dispute this fact.

bankruptcy proceeding.  As would be expected, the experts did not agree on very many points as to what should have been disclosed in the Barber bankruptcy and what was not required to be disclosed. In fact, the Government's expert testified that she had actually changed her opinion about certain technical bankruptcy requirements after studying this case in preparation for trial.  It should be noted that both experts were highly qualified, experienced bankruptcy attorneys who were reviewing this case with the substantial benefit of hindsight and the luxury of time for thoughtful and thorough consideration.  They were called to testify as to what they believe bankruptcy law requires, and even they could not agree as to what was required given the complex factual scenario of this case.  In contrast, Knight was by no means a particularly experienced bankruptcy attorney.[39]  Where two experienced bankruptcy attorneys, each of whom had handled thousands of bankruptcy cases over the courses of their careers, could not agree on what Knight should have disclosed on the bankruptcy forms, the Court  finds that the relevance and import of the bankruptcy disclosures as to whether Knight had the requisite criminal intent to conceal bankruptcy assets at the time of the transfers through his trust account were made is substantially lessened.  The Court will, however, go through the evidence presented as to the particular non-disclosures argued by the Government in this case.

As to the transfers through his trust account generally, Knight testified that he did not disclose the transfers of Barber's funds through his trust account in Barber's personal bankruptcy because he believed the transfers were made in the ordinary course of Barber's business as a real estate developer.  The Statement of Financial Affairs in bankruptcy requires the debtor to "[l]ist all other property, other than property transferred in the ordinary course of business or financial affairs

---

[39]   Knight had been out of law school for less than six years at the time he began his representation of Barber.  As to bankruptcy experience in particular, even by the Government's estimation, Knight had participated in 52 bankruptcies, to include adversary proceedings.

of the debtor, transferred either absolutely or as security within **two years** immediately preceding the commencement of the case." (Gov't Ex. 55b) (emphasis in original).

As previously stated, John Terry Lee testified that the transfers out of Knight's trust account were the transfers that should have been disclosed in Barber's personal bankruptcy proceeding, as transfers into the trust account would not have been absolute transfers. On cross-examination, however, Lee testified that it was possible that at least some of those transfers out of the trust account could have been considered to have been made in the ordinary course of business if a regular bank account had been used. Lee simply found it unusual that a lawyer's trust account had been used. The evidence was not compelling, however, that the mere use of Knight's trust account in an "unusual" manner to make transfers, as opposed to use of a "regular" checking account in Barber's name, somehow mandated disclosure of transfers that would otherwise not have to be disclosed in bankruptcy.

David Nixon, the bankruptcy expert called by Knight, testified that many of the transfers out of Knight's trust account could reasonably have been found to have been made in the ordinary course of Barber's business as a real estate developer. Nixon testified that other transfers, such as transfers to pay off Barber's gambling debts, could possibly be considered to be in the ordinary course of Barber's financial affairs.

Jill Jacoway testified that she thought both transfers into and out of the trust account should have been disclosed in Barber's bankruptcy. Jacoway initially testified that she had calculated 20 individual transfers into Knight's trust account and 85 transfers out and that she believed all 105 should have been reported somewhere on Barber's bankruptcy petition. On cross-examination, however, Jacoway hedged that opinion in regard to several of the transfers she specifically testified

about, saying the transfers might not have to have been disclosed in the context that counsel for Knight presented.  Whether the context presented by counsel for Knight was, in fact, the context in which the transfers to and from the trust account occurred, Jacoway testified that she did base her opinions on the transfers without knowing any explanation or context for why the transfers were made.  Because decisions about disclosures in bankruptcy necessarily require some degree of context, an opinion based entirely on a black-and-white analysis of transfers, while relevant, inherently leaves room for doubt as to the absolute validity of the opinion.

Christy Bennett, who was involved in directing the majority of the payouts from Knight's trust account on Barber's behalf, testified that the money that she was involved in directing Knight to pay out of his trust account was for ordinary business expenses of Barber or an entity.

Specifically as to the transfer of $150,000 from Knight's trust account to an account held by Epsilon in November 2008, Van Doren testified both that he did not intend to ever give the $150,000 back to Barber but also that he thought of it as Barber's money.  Although Van Doren ultimately kept all but $27,000 of the $150,000 to pay off an "antecedent debt" that Van Doren claimed Barber owed him for losses on the Sloan Estates property (again, it is not clear what obligation Barber actually had to indemnify Van Doren for those losses or why), Van Doren testified that Knight knew that the money was transferred ultimately to help Barber.  Van Doren also testified, however, that he definitely thought that Epsilon had legal claim to nearly all the money transferred into the Epsilon account.  Other testimony and evidence tended to show that the money was meant to be used to infuse Epsilon with capital in order to induce Bank of Fayetteville to loan Epsilon money on another real estate deal involving Epsilon, Barber, and Whorton.  Epsilon did apply for a loan from Bank of Fayetteville, with their assets buoyed by the influx of $150,000, which Van Doren (Epsilon) listed

as an asset of Epsilon's in the loan application.  Van Doren testified that the listing was not false, as the $150,000 was, in fact, money that belonged to Epsilon.  The loan was declined on November 21, 2008.  Van Doren testified that he did not know if he ever told Knight that the deal did not go through, nor did he discuss with either Barber or Knight what to do with the $150,000 after the deal fell through.  It is clear that, at the time the transfer was made, Barber directed the transfer in the hopes that he would be able to generate more money for himself via the anticipated real estate transaction.  Various lawyers aside from Knight were involved in the anticipated deal with Epsilon. Van Doren testified that no lawyer ever suggested that transferring the $150,000 would be illegal or ill-advised.

The Government argued that the $314,000 wired from Whorton to Knight's trust account should have been disclosed as well.  The extent of Knight's knowledge as to the purpose of that wire transfer at the time the bankruptcy schedules were filed remains unclear.  Although Knight concedes that the evidence now shows that the money was not a loan Whorton made to Barber, Knight claims that at the time the bankruptcy schedules were filed he thought the money was a loan and not a commission to Barber.  Some evidence presented at trial supports that theory.  The wire occurred weeks after the Executive Plaza closing; Knight's knowledge of or involvement in the Executive Plaza deal is unclear; the wire occurred just one day before Barber was to send funds to Epsilon in anticipation of a deal involving Whorton; and Whorton did, at various points in time, loan money to Barber, including on July 23, 2009, just over a week before Barber filed for bankruptcy.  Without stronger evidence that Knight was an active participant in accepting or encouraging the money to go through his trust account, with knowledge of its purpose and origin, it is hard for the Court to make the inference that Knight formed any sort of criminal intent in receiving these particular funds.

-78-

The Government argued that Knight made, or assisted in making, a false disclosure to the bankruptcy court by not disclosing the existence of EIA.  Knight testified that he did not even realize that EIA had been omitted until after he was indicted in this criminal case.  Knight admitted during his testimony that EIA should have been listed and that he made a mistake in not making sure it was disclosed—that there was no conscious decision to omit it.  Knight testified that nobody mentioned to him, until the instant criminal litigation, that EIA was not listed.  The evidence presented preponderated in favor of a finding that the omission was in fact a mistake and not an intentional false declaration made in an attempt to conceal prior activity.  Bennett sent an entity list to Mason Wann to include in the bankruptcy filings.  (Def. Ex. 98).  EIA was not included on that list.  Bennett did not recall why EIA was not on the list.  By all appearances, the list sent by Bennett and received by Wann was the same list attached to Barber's bankruptcy filings.  There was no evidence presented to show that Knight took any affirmative action to ensure that EIA was not disclosed.  At most, the inference can be made that Knight allowed the list to be filed knowing that it was not complete.  This inference is not enough to then trigger an inference that Knight must have passively allowed the filing in an attempt to conceal his involvement with any transfers received from the Ballpark and Spring Creek transactions with which EIA was involved.  Furthermore, it is not clear what benefit either Barber or Knight might have gained in intentionally not disclosing EIA in the bankruptcy proceeding.  EIA had no assets available for recovery, and the connection between a motive in not disclosing EIA in Barber's bankruptcy and Knight's intent in involvement with transfers stemming from the Ballpark and Spring Creek transactions is tenuous at best.

The Government also presented some argument and evidence that Knight should have appropriately amended the bankruptcy filings to account for the transfers by Barber of $30,000 in

cash and a $64,000 check to Van Doren.  After agreeing to represent Barber in his bankruptcy adversary proceeding a week before the AP was scheduled for trial, Knight read the deposition given by Van Doren in connection with that proceeding, where he learned of the transfers by Barber to Van Doren.  On August 15, 2010, Knight sought advice from Tim Tarvin as to whether he should amend the bankruptcy schedules to account for the transfers.  (Def. Ex. 137).  Tarvin advised that he thought Knight should amend because, even if the transfers were not absolute (and thus arguably not required to be disclosed), disclosing the transfers would "look better."  (Def. Ex. 201).  The schedules, ultimately, were not amended to include the transfers to Van Doren.  The Government argued that the failure to amend was again evidence of a desire to conceal.  The string of emails between Knight and Tarvin, however, appears to evidence Knight's lack of prior knowledge as to the transfers to Van Doren as well as good-faith effort to make a reasoned decision in the bankruptcy case.  Knight testified that he ultimately did not believe that either the check or the cash needed to be disclosed because they were not absolute transfers.  Although this particular non-disclosure may have had some limited relevance to adding context to the charged conspiracy, it does not appear to shed much light on Knight's mindset at the time of the transfers through his trust account.

Finally, the Government presented evidence that, after Knight agreed to enter his appearance in the adversary proceeding just one week before the proceeding was to go to trial, Knight emailed Marshall Ney to ask if Ney would object to a continuance.  (Gov't Ex. 54).  Ney said he would object and informed Knight that, if the trial were continued, his next step would be to subpoena Knight's law firm's bank records because questions had been raised about money flowing through his trust account.  *Id*.  Knight ultimately did not move for a continuance.  While the fact that Knight did not move for a continuance after receiving Ney's email may serve as some circumstantial evidence that

he did not want his firm's bank records to be subpoenaed, it is weak evidence as to Knight's intent

to conceal his account activity, and even weaker evidence as to Knight's intent at the time the

transfers through his account were made.   The fact that Knight did not want to have his firm's

records subpoenaed, or that he did not move for a continuance in the face of an objection from Ney,

is not conclusive evidence that he must have had something to hide.

Again, as to these disclosures, an attorney must be entitled to give some reasonable amount

of reliance to representations made by his client.  The evidence tended to show that Knight, with his

associates Wann and Pratchard, relied to a large extent on information provided by Barber and

Bennett when filling out Barber's bankruptcy schedules.  Bennett preliminarily filled out Barber's

SOFA to the best of her knowledge based on records she had in her possession.  (Def. Ex. 143).

Bennett marked certain questions that Barber needed to answer.  *Id*.  She marked the question asking

for a list of entities with a note saying she needed to get an old entity list.  *Id*.  Knight also testified

that he advised Barber to disclose everything—that Knight would rather Barber disclose too much

than not enough.  Knight testified that he learned, during the course of the adversary proceeding, that

Barber had actually lied to him countless times.  The evening after the first day of the trial of the

adversary proceeding, Knight emailed his associate, Wann, and expressed his frustration.  (Def. Ex.

177).  Knight told Wann that Barber testified that he had signed over the $64,000 to Van Doren

because he didn't have a bank account at the time and that Ney had then walked Barber through three

or four accounts that were open at that time in his name.  *Id*.  Knight told Wann in the email that

Barber "told us a long time ago those accounts were closed."  *Id*.  At trial, Knight testified that he

wanted to crawl under the table during Barber's testimony at the adversary proceeding because of

all the lies that Barber was telling.  An attorney cannot be held accountable for the lies of his client

without stronger evidence that the attorney actually knew or had some basis to believe that his client was not being fully honest with him.

• **Other Disclosures**

Aside from any evidence of disclosures made by Knight only as attorney for Barber, there was some evidence presented as to disclosures made by Knight independently in response to inquiries from the Arkansas Office of Professional Responsibility. The head of that office, Stark Ligon, testified that Knight responded "promptly" to his inquiries, prompted by the footnote in Judge Barry's opinion, regarding the use of his trust account. Ligon testified that he was satisfied with Knight's explanations and accounting of the $688,000 in escrow funds, assuming their accuracy. Ligon stated that he had received no reports of unethical conduct by Knight from anyone involved in the bankruptcy case. Ultimately, Ligon wrote a letter to Knight thanking him for his prompt and detailed response and informing Knight that the file with the Office of Professional Responsibility regarding the inquiry would be closed. Ligon did qualify his statements by stating that he did not conduct a thorough investigation of the facts, as he generally left more thorough investigations to law enforcement authorities.

### 4.   NWARE

The Government presented evidence as to the formation of NWARE, arguing and implying that Knight's involvement in that formation was evidence of his participation in a fraudulent scheme. The Government argued that NWARE was not a legitimate business entity but, instead, was used as another mechanism to conceal Barber's assets. Knight's involvement in the formation of NWARE may be evidence of intent to defraud only to extent that the evidence shows that NWARE was, in fact, created for fraudulent purposes and that Knight knew of those fraudulent purposes. The

relevance to Count 2, however, is further attenuated by the fact that Knight did not receive money *into* his trust account from NWARE.  At the time NWARE became fully operational, all transfers into Knight's trust account by Barber had been made.  Rather, Knight made transfers *from* his trust account to an account held by NWARE.  Therefore, the relevance as to an intent to defraud at the time Knight accepted any money *into* his account is not clear.  Much like with the evidence of non-disclosures, Knight's involvement in the formation of NWARE and in transferring money to NWARE, for purposes of Count 2, is relevant only to the extent that it might serve as circumstantial evidence of a continuing intent to conceal earlier fraudulent activity.

Knight does not dispute his involvement in the formation of NWARE.  The circumstances surrounding the formation of NWARE are, however, disputed.  Originally, Knight helped Barber to form NWARE in order to receive contemplated proceeds from the Executive Plaza transaction.  However, no funds from the Executive Plaza transaction were ever deposited directly into the NWARE account.  Rather, they were eventually wired by Whorton directly into Knight's trust account.  It appears that NWARE was instead ultimately used as a replacement for Barber Group, which was essentially forced out of business by mounting tax liens.  Knight testified that, after Barber told him that Whorton and Combs had backed out on the finders fee deal for the Executive Plaza transaction, NWARE was still not operational.  No operating agreement had been filed.  On November 3, 2008, an insurance agent emailed Christy Bennett to let her know that "BlueCross has been told that The Barber Group is out of business and is asking questions.  We need to address this or they will cancel the group." (Def. Ex. 4).  Bennett, who was then pregnant, immediately emailed Barber and Knight saying that they had to get a new entity formed so that they could transfer the insurance over.  *Id*.  Although NWARE was formed on October 6, 2008, the operating agreement

was not forwarded to Barber for his signature until November 7, 2008. (Gov't Ex. 40). Knight suggested in an email dated November 11, 2008, that Barber use Bennett's home address for NWARE because Knight did not think it was a good idea for NWARE to have the same address as Barber Group. (Gov't Ex. 41). Barber and Bennett agreed to use Bennett's address. Given the evidence presented at trial, the Court is not convinced that the formation of NWARE or the use of Bennett's address is strong evidence of an intent by Knight to commit fraud. Furthermore, the disclosure of NWARE in the Legacy Bank action and in Barber's personal bankruptcy proceeding weighs against finding that Knight formed or used NWARE to intentionally defraud Barber's creditors.

### 5.    Knight's Attorney's Fees

The Government presented evidence at trial as to the amount of fees Knight received for his representation of Barber, with the implication being that perhaps these fees were not deserved, and that Knight was gaining a benefit from a scheme to commit bankruptcy fraud. Agent Kimbrough testified that the investigation turned up only a single bill from Knight to Barber over the course of Knight's representation of Barber. (Gov't Ex. 76). This bill was for Knight's firm's representation of Barber subsequent to Barber filing for personal bankruptcy. Despite Agent Kimbrough's testimony, the evidence revealed that Knight did send at least one other bill to Barber during the relevant time period. During the month-and-a-half covered by the first bill Knight sent to Barber, dated March 6, 2008, Knight billed Barber for 191 hours at a rate of $200 per hour for a total of $37,400. (Def. Ex. 176). The time was accounted for on the bill in a detailed manner. It was at that point that Knight testified he proposed charging Barber a flat rate of $17,000 a month. Knight then later billed separately for his firm's representation of Barber during Barber's personal bankruptcy

-84-

proceedings.  (Gov't Ex. 76; Def. Ex. 148).

Beginning in early 2009, it appears that Barber got behind in his payments to Knight.  Any funds that Barber had in Knight's trust account had been depleted.  When Barber decided to go ahead and file for personal bankruptcy in July of 2009, Barber and Knight entered into a separate representation agreement.  (Def. Ex. 148).  The agreement contemplated that Barber would pay the Knight Law Firm a total of $20,000 (a non-refundable fee of $19,701.00 plus $299.00 for a filing fee).  *Id*.  It was "expressly understood" by the parties to the agreement that the $20,000 was paid only for work involved up to the first meeting of creditors and that, "in event [sic] Client desires for attorney to assist with any further representation (including, but not limited to, adversarial proceedings), then Client agrees to pay Attorneys their current hourly rate for such services."  *Id*.  This $20,000 retainer was paid by others on Barber's behalf.

No party disputed that Barber was fighting numerous lawsuits at the time that Knight began his representation of Barber.  Knight's initial detailed bill also shows that Knight was spending a lot of time on Barber's various legal issues.  In early February 2008, Knight expressed to Tim Tarvin that he thought Barber could "expect to pay me $15K to $20K per month as long as he wants to fight all these lawsuit [sic], foreclosures, etc."  (Def. Ex. 192).  Knight also stated that he would have to hire another associate, or possibly even partner with someone, if Barber was going to be fighting his various lawsuits for months.  *Id.*

The Court cannot find that either an hourly rate of $200 or a monthly rate of $17,000 was unreasonable under the circumstances.  Despite the fact that the Government had numerous bank records at its disposal, no evidence was presented that Knight was transferring undue amounts of attorney's fees from his trust account to himself.  Nor was any convincing evidence presented that

Knight was otherwise receiving such sums of attorney's fees so as to legitimately raise an inference of an unlawful motive in his representation of Barber.

Barber was undoubtedly Knight's main client and probably the source of the vast majority of income to Knight's law firm in 2008. While Barber was paying in 2008, Knight would certainly have had a motive to keep Barber as a client. It may have even motivated Knight, in part, to allow Barber to use his trust account as he did. This does not, however, create a strong inference that Knight must have been engaged in joint criminal activity with Barber. Knight's receipt of attorney's fees must be analyzed taking into account the reasonableness of those fees based on the services performed by Knight and his firm. The evidence presented in this case did not show that the fees received by Knight were unreasonable. It is also important to note that any fees received were not monies that went directly into Knight's pocket. Rather, they were fees received by his firm that were presumably also used to pay associates, business expenses, filing fees, and other litigation costs on behalf of Barber. Knight testified that he, in fact, hired associates to help him with the workload generated for his firm by Barber.

### 6.     Conclusion as to Evidence of Intent to Defraud

The evidence regarding Knight's mindset at the time the transfers were made was far from overwhelming in regard to whether he had any general intent to defraud in allowing Barber to pass money through his trust account. The circumstantial evidence relied on by the Government, as discussed above, analyzed either separately or as a whole, was not strong. There are arguably only two people that could have testified as to the purpose of Knight allowing Barber to use his trust account—Knight and Barber. No other witness had direct knowledge of what Knight knew or intended, and the documentary evidence presented required numerous inferential leaps to presume

that Knight acted with fraudulent intent.  Knight testified, as would be expected, that he did not

intend to defraud Barber's bankruptcy creditors.  Barber did not testify to rebut Knight's testimony.

While the jury could legitimately have found that Knight's testimony was not credible, the burden

remains on the government to produce proof beyond a reasonable doubt to satisfy each element of

each offense.  The evidence as to Knight's intent in allowing Barber to pass funds through his trust

account preponderated sufficiently heavily against a verdict of guilty on Count 2, such that a

miscarriage of justice may have occurred.  Because a conviction based on aiding and abetting

requires a finding of shared criminal intent of the principal, the Court likewise finds that a new trial

should be granted on this alternative basis even if considering that Knight's conviction may have

been based on a theory of aiding and abetting.

### C.    Counts 4 – 8: Money Laundering

As set forth in the Court's final instructions to the jury, to convict Knight on Counts 4

through 8, money laundering in violation of 18 U.S.C. § 1957, the Government was required to

prove beyond a reasonable doubt, as to each count, that:

1.    On or about [the date alleged for the particular count in the indictment], the
defendant knowingly transferred funds from his IOLTA account at Arvest
Bank to [an account held by Brandon Barber or his entity, NWARE];

2.    The transfer of funds was of a value greater than $10,000 derived from
bankruptcy fraud—concealment of assets, [as previously defined];

3.    The defendant knew, at the time of the transfer, that the transfer of funds
involved proceeds of a criminal offense;

4.    The transfer of funds took place in the United States; and

5.    The transfer of funds in some way or degree affected interstate commerce.

*See, e.g.*, *United States v. Huber*, 404 F.3d 1047, 1057 (8th Cir. 2005) (elements of money

laundering under § 1957 are (1) defendant engaged in a financial transaction that (2) involved the proceeds of specified unlawful activity, and (3) the transaction consisted of property with a value greater than $10,000).

The defense argues that the Court should enter a judgment of acquittal as to Counts 4 through 8 because there was no evidence presented at trial that proved or tended to show that the money transferred in each count was derived from the specified unlawful activity of bankruptcy fraud as prohibited by 18 U.S.C. § 152(7) and therefore the Government could not satisfy its burden as to element two.  In the alternative, the defense argues that the Court should grant a new trial as to Counts 4 through 8 because the evidence preponderates sufficiently heavily against the verdict as to that count that a serious miscarriage of justice will occur if the Court does not grant Knight a new trial.

As set forth above, the Court has found that the evidence was sufficient to support the jury's verdict of guilty as to bankruptcy fraud under 18 U.S.C. § 152(7).  No other elements of the money laundering offenses were challenged, and the Court finds that the evidence was sufficient to satisfy those elements as well.  The Court finds that Knight's motion for judgment of acquittal as to counts 4 through 8 should likewise be denied.

However, because the Court has found that the evidence preponderates sufficiently heavily against a finding that the specified unlawful activity of bankruptcy fraud occurred, the Court finds that Knight's motion for new trial should be granted as to Counts 4 through 8.  As to any alleged actor—either as principal, aider and abettor, or conspirator—the evidence simply did not preponderate in favor of a finding of a sufficient connection between the alleged acts taken and Barber's eventual filing for personal bankruptcy.  Nor did the evidence preponderate in favor of a

finding that Knight acted with an intent to defraud.  The Court notes that Agent Williams testified

that, in his opinion, certain transfers into Knight's trust account represented proceeds of concealment

of assets from judgment creditors.  Other references were also made as to whether Barber's funds

were concealed from creditors, including in the wording of the indictment.  (Doc. 157, ¶¶ 15-17).

Concealment of assets from judgment creditors or creditors generally is not, however, the specified

unlawful activity charged in any of the money laundering counts.  Rather, the Government charged

the specified unlawful activity as bankruptcy fraud in violation of 18 U.S.C. § 152(7), and the

Government must be held to that charge.

> **D.**     **Count 3: False Statements in Relation to a Bankruptcy Case**

As set forth in the Court's final instructions to the jury, to convict Knight on Count 3, false

statements in violation of 18 U.S.C. § 152(3), the Government had to prove beyond a reasonable

doubt that:

1.  On or about a certain date from July 31, 2009 through November 9, 2010, there was a bankruptcy case pending in the United States Bankruptcy Court for the Western District of Arkansas in which Brandon Barber was the Debtor;

2.  The defendant made a material false statement in relation to the bankruptcy proceeding;

3.  The defendant knew the statement was false when it was made; and

4.  The defendant made the statement with the intent to defraud.

The jury was instructed that "to act with intent to defraud means to act knowingly and with the intent

to deceive someone for the purpose of causing some financial loss to another, or bringing about a

financial gain to oneself or another, to the detriment of a third party."  *See United States v. Markert*,

732 F.3d 920, 930 (8th Cir. 2013) (upholding substantially similar instruction as to meaning of

"intent to defraud").

In this case, Knight was not charged with the substantive offense of making a false statement. Rather, he was charged with aiding and abetting Barber in making a false statement under penalty of perjury in relation to Barber's bankruptcy case. Specifically, the indictment charges:

> From on or about July 31, 2009, through on or about November 9, 2010 . . . Brandon Lynn Barber, *aided and abetted by* K. Vaughn Knight, did in this district and elsewhere, knowingly and fraudulently make a material false declaration, certificate and verification, under the penalty of perjury, in and in relation to a case under Title 11 United States Code, namely in In re: Brandon Lynn Barber, Debtor, No. 5:09-bk-73807, by submitting a Statement of Financial Affairs, in which the defendants fraudulently omitted up to or exceeding $1,000,000 in income belonging to Barber, for calendar year 2008 and instead reported income of $3,426.95 for calendar year 2008.

(Doc. 157, ¶ 22) (emphasis added).

The defense argues that the Court should enter a judgment of acquittal as to Count 3 because there was no evidence presented at trial that Knight aided and abetted Barber in making false statements, made a statement to the bankruptcy court, or had any intent to defraud and that, therefore, the Government did not satisfy its burden as to elements three and four of Count 3. In the alternative, the defense argues that the Court should grant a new trial as to Count 3 because the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice will occur if the Court does not grant Knight a new trial.

At trial, the Government pointed to various alleged omissions and false statements in the bankruptcy filings. These issues have been discussed, in large part and at length, above. The only false statement that the Government actually charged in Count 3, however, was that Barber, aided and abetted by Knight, submitted a SOFA that "fraudulently omitted up to or exceeding $1,000,000 in income belonging to Barber, for calendar year 2008 and instead reported income of $3,426.95 for

calendar year 2008." (Doc. 157, ¶ 22).  The Court notes that it appears an error was made when instructing the jury as to this Count.  Because the only false statement charged was the statement of Barber's income on the SOFA, the Court should have required the jury to unanimously find that Knight aided and abetted Barber in making that specific false statement.  While the instruction given was in line with the parties' submissions and with the Eighth Circuit Model Jury Instructions, the Court does not believe that the instruction was entirely correct in this case.  Given the fact that so many potential false statements were discussed throughout this case, the jury certainly could have found Knight guilty of making a false statement that was not specifically charged.  While Knight did not raise this issue in his brief, the Court finds that this instruction, in the context of this case, was clearly erroneous, and such error alone would warrant the granting of a new trial on this Count.  For the reasons set forth below, however, the Court finds that Knight is entitled to a judgment of acquittal on Count 3 as the evidence presented at trial was not sufficient to show that Knight aided and abetted the making of the particular false statement charged.

Pursuant to 18 U.S.C. § 152(3), a person is prohibited from "knowingly and fraudulently mak[ing] a false declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, in or in relation to any case under Title 11."  The statute therefore also requires, in addition to the elements contained in the jury instruction as to Count 3, that the offending statement be a sworn statement, which was not included in the instructions as an element of the offense.  This was also an error.  Taking this additional requirement into consideration, the Government could not have charged Knight with independently making a false statement on the SOFA, since the SOFA is signed only by the debtor under penalty of perjury.  Fed. R. Bankr. P. 9011, advisory committee notes, subdivision (a) (statements of financial affairs are

excepted from the papers which an attorney for the debtor must sign, stating that Rule 1008 requires that the SOFA be verified by the debtor).  The attorney, Knight, does not swear to the truth of the statements therein.  Therefore, Knight may only be found guilty under 18 U.S.C. § 152(3), as charged by the Government in Count 3, if the Court can find that he aided and abetted Barber in swearing out a false statement in the SOFA.

The SOFA required Barber to "[s]tate the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business . . . from the beginning of this calendar year to the date this case was commenced.  State also the gross amounts received during the **two years** immediately preceding this calendar year." (Gov't Ex. 55b) (emphasis in original).  The Government challenges only the information listed for calendar year 2008.  For 2008, Barber reported $714.69 in income from NWARE and wages of $2,712.26 from Barber Group.  *Id*.  Barber signed the SOFA under penalty of perjury, declaring that he had "read the answers contained in the foregoing statement of financial affairs and any attachments thereto and that they are true and correct."  *Id*.  Knight did not sign the SOFA, nor was he required to pursuant to Federal Rules of Bankruptcy Procedure 1008 and 9011.  The Government argued at trial that income received by Barber through the various real estate transactions, and particularly income received by EIA, should have been included as part of Barber's gross income on the SOFA.

### i.   Motion for Judgment of Acquittal

#### a.   Aiding and Abetting

The Eighth Circuit has stated that a defendant may be convicted of making a false statement under an aiding-and-abetting theory if the government proves that the defendant knew that another person was making a false statement on a form, as prohibited by law, and the defendant "committed

an affirmative act to further [the] offense." *United States v. Hayes*, 574 F.3d 460, 476 (8th Cir. 2009) (citing 18 U.S.C. § 2(a) and *United States v. Mitchell*, 388 F.3d 1139, 1143-44 (8th Cir. 2004) (listing three essential elements for aiding and abetting)). In the *Hayes* case, the Eighth Circuit found that where the evidence showed that the defendant was merely working closely with the person filling out the form at issue in a supervisory role, and even directed the person as to how to fill out certain information, the evidence was lacking as to the defendant's knowledge of the particular falsification at issue and as to defendant committing an affirmative act to further the offense. *Id.* at 477. Ultimately, the Eighth Circuit found that the district court in that case had erred in denying the defendant's motion for acquittal as to the false statement offense charged (in violation of 18 U.S.C. § 1035). *Id.* at 477-78. The Court finds that the evidence of aiding and abetting the making of a false statement in this case is even more slight than that presented in *Hayes*.

A lawyer cannot be subject to criminal liability by virtue of his representation of a client alone. There was no evidence presented in this case—and certainly not evidence sufficient to sustain a guilty verdict—that Knight independently influenced how Barber arrived at the number to list as his income on the SOFA. The Court cannot surmise that Knight must have done so by mere virtue of the fact that Knight was Barber's lawyer. Likewise, there was insufficient evidence to show that Barber in any way relied on Knight in determining or calculating his personal income for the calendar year 2008. There was insufficient evidence to show that Knight had, or should have had, independent knowledge of Barber's total gross income for 2008 or any other year, especially taking into consideration the complex issues stemming from Barber's involvement with various entities.

While an attorney does have a general duty to make a reasonable inquiry as to statements made to the Court by a client, there was insufficient evidence in this case to show that any inquiry

-93-

made by Knight was unreasonable under the circumstances. Under Rule 9011, an attorney has a duty of undertaking a reasonably inquiry to avoid the imposition of civil sanctions. Fed. R. Bankr. P. 9011(b) (by presenting a paper to the court, an attorney "is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" that the contents are at least likely to have evidentiary support and that "the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument"); *In re Phillips*, 433 F.3d 1068, 1071 (8th Cir. 2006) (pursuant to Rule 9011, by signing a bankruptcy petition, "the attorney certifies that to the best of his or her knowledge, there is a factual and legal basis for the petition"). The Rule does not, however, mandate exhaustive research and investigation before commencing a bankruptcy case. Moreover, as already noted above, the SOFA is excepted from the papers that must be signed by a debtor's attorney. Thus, civil sanctions cannot be imposed on an attorney for transgressions surrounding the SOFA. While the Court recognizes that the criminal statute at issue in Count 3 is separate and distinct from Rule 9011, the Court finds the rules of bankruptcy to be instructive in this case in which Knight is charged with defrauding the bankruptcy court. It would seem strange to impose criminal penalties for bankruptcy fraud where the bankruptcy rules provide that no civil penalties may be imposed. Furthermore, legislative history indicates that Congress intended that actions permitted by the bankruptcy code not be prosecutable as criminal bankruptcy fraud. *See, e.g.*, 140 Cong. Rec. H10752-01 ("courses of action permitted under the Bankruptcy Code and allowed by the bankruptcy courts are unlikely to be prosecutable under this new law or any fraud statute . . . The proposed [bankruptcy fraud] statute[40] is no broader

---

[40] The Court recognizes that these statements were made in specific reference to 18 U.S.C. § 157. The Court believes, however, that the statements apply with equal force to 18 U.S.C. § 152, as both statutes are meant to curtail bankruptcy fraud.

than the mail fraud statute, and in many respects is narrower because of the body of bankruptcy law potential defendants could point to in justifying their actions. The courts have the ability to ensure that this proposed law is not abused . . . .").

In an email to Barber dated October 26, 2009 (before the amended petition was filed on October 31, 2009), Knight told Barber, "we need to discuss your income and make sure we are comfortable with how we have it listed. I would rather have too much disclosed on their [sic] than not enough." (Def. Ex. 110). It does not appear, therefore, that Knight was encouraging Barber to under-report his income on the SOFA. Also, as previously noted above, it appears that as to the SOFA, Knight relied in large part on information gathered by Christy Bennett, who was working with Mason Wann and Lauren Pratchard. In response to an inquiry by Bennett about NWARE, Wann responded that Barber should report any personal payments he received out of NWARE as income to Barber. (Def. Ex. 106). Bennett did not recall if she ever gave that information to Wann or anyone else at the Knight Law Firm. The emails evidence that there was some back-and-forth exchange in an attempt to compile information for the SOFA. Without receiving complete information from Barber and Bennett, Knight—or Wann or Pratchard—would have no way of independently verifying or calculating income to Barber from NWARE or total gross income in general.

No referral of Knight was made to the United States Attorney's Office in connection with Knight's representation of Barber in Barber's bankruptcy case. Furthermore, no motion for sanctions was made pursuant Bankruptcy Rule 9011. While these facts do not mean, by themselves, that no criminal offense was committed, they indicate that no one who was involved with the bankruptcy proceedings thought that Knight's behavior was questionable or egregious enough to warrant seeking

civil or criminal sanctions at that time.  If a concern had been raised at that time, Knight would have had the opportunity to give an explanation for any questioned actions through civil sanctions motion practice.  *In re Young*, 2014 WL 944846, at *5 (8th Cir. BAP Mar. 12, 2014) ("Notice and an opportunity to be heard must be afforded to the party to be sanctioned prior to the imposition of sanctions.").  The Eighth Circuit has in fact found a referral of an attorney to the United States Attorney's office to be "abusive" and too "heavy-handed" for a violation of Rule 9011 where an attorney filed a bankruptcy petition on behalf of a client—using an old signature of the client's on file to represent that the client signed the petition under penalty of perjury—without the client's knowledge.  *Phillips*, 433 F.3d 1068; *see also In re Thayer*, 384 B.R. 546 (8th Cir. BAP 2008) (reversing imposition of sanctions against attorney under Rule 9011 and finding that the attorney was actually fulfilling his obligation to represent his client vigorously and zealously in presenting apparently contradictory legal arguments to the bankruptcy court, where such arguments had some arguable basis in law).  A criminal jury trial that takes place three years after-the-fact is a much harder forum in which to explain technical actions in a bankruptcy proceeding.

The Court finds that the evidence that Knight knew that Barber was making a false statement as to his 2008 income on the SOFA and committed an affirmative act to further the offense was insufficient to sustain a verdict of guilty as to Count 3.  Knight's motion for judgment of acquittal will therefore be granted as to Count 3.

### b.    False Statement

Furthermore, as an alternative basis for granting Knight's motion for judgment of acquittal as to Count 3, the Court finds that the evidence was insufficient to show that a false statement was made within the meaning of 18 U.S.C. § 152(3).

The bankruptcy experts called by Knight and the Government in this case did not agree on many issues, but one thing they did seem to agree on was that there was a reasonable basis in the law for not reporting entity income as personal income on the SOFA in a bankruptcy case. Both experts essentially agreed that they would not have included income to Barber's entities in calculating Barber's gross income on the SOFA, regardless of whether the Court might later determine that an entity or entities was an alter ego of Barber. The Government's case as to Count 3 relied on the fact that Barber's income was under-reported as a result of not including income to his entities. It appeared, based on the Government's presentation of testimony and evidence at trial, that the Government's case was based, at least in part, on the theory that reportable taxable income is the same as gross income that should be reported in bankruptcy. The Government solicited testimony as to conversations that took place, and information that was gathered, to enable Barber to adequately file his taxes for 2008 and 2009. No evidence or testimony was presented, however, that would convince the Court that tax law and bankruptcy law have the same or similar provisions in regard to this issue.

David Nixon testified that the gross income question on the SOFA is limited to income to the debtor himself. Nixon further testified that a single-member LLC is not disregarded for bankruptcy purposes, and a debtor is not required to list gross receipts of business entities in a personal bankruptcy. Jill Jacoway testified that whether entity income should be reported as personal income is an area of uncertainty in the law. Jacoway stated that, up until her preparation for testifying in this case, she did not even think that there was a way to report entity income. Jacoway testified that she would agree that Knight had a reasonable legal basis for concluding that entity income was not required to be reported as personal income for Barber.

The Court finds that the evidence that a false statement was made by Barber on the SOFA as to his 2008 income was insufficient to sustain a verdict of guilty as to Count 3.

### c.      Good-Faith Defense

Finally, the Court finds that the evidence showed that Knight had a good-faith basis for any advice he may have given Barber regarding not reporting entity income on the SOFA.  The jury was instructed in this case that:

> Good faith is a complete defense to the charge[] of . . . false statements, because good faith on the part of the defendant is, simply, inconsistent with . . . an intent to defraud.  The essence of the good-faith defense is that one who acts with honest intentions cannot be convicted of a crime requiring . . . intent to defraud.
>
> The phrase 'good faith' includes, among other things, an opinion or belief honestly held, even if the opinion is in error of the belief is mistaken . . . . Proof of . . . intent to defraud required more than proof that a defendant only made a mistake in judgment or management, or was careless.

Where, as in this case, two expert witnesses with extensive bankruptcy experience agree that they would not have reported entity income on the SOFA and where the charge against Knight is based on aiding and abetting Barber in not reporting entity income for Barber on the SOFA, the Court finds that Knight had a good-faith basis for any advice he may have given Barber in this regard.  Because good faith is a complete defense to Count 3, Knight is entitled to a judgment of acquittal on this alternative basis.

For all of the above reasons, the Court finds that the evidence was insufficient to sustain a verdict of guilty on Count 3 and that the jury's verdict of guilty as to that Count should be set aside and a judgment of acquittal entered.

### ii.      Conditional Ruling on Motion for New Trial

Federal Rule of Civil Procedure 29(d)(1) requires that "[i]f a court enters a judgment of

acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed.  The court must specify the reasons for that determination."  In compliance with this Rule, the Court conditionally determines that, in the event the judgment of acquittal as to Count 3 is overturned on appeal, Knight's motion for a new trial as to Count 3 should be granted.  The Court conditionally grants the motion for a new trial on the basis that the evidence, as recited above, preponderates sufficiently heavily against a verdict of Count 3 such that a miscarriage of justice may have occurred. Specifically, the evidence as to the following elements was largely lacking: (1) Knight's making an affirmative act in furtherance of Barber making the charged false statement, (2) the fact that a false statement was made, and (3) Knight's intent to defraud, taking into consideration the good-faith defense.  Finally, the Court finds that a new trial should be conditionally granted as to Count 3 on the basis that the Court's instructions may have allowed the jury to convict Knight of aiding and abetting a false statement not specifically charged in the indictment.

## IV.    Conclusion

After a nine-day trial and the admission of thousands of pages of documents into evidence, the jury returned a verdict on all counts in approximately six hours.  Given the complexity of the law and the volume of evidence in this case, the jury was given the impossibly difficult task of parsing out the truth and applying it to the law for eight separate counts.  Because of the difficulty of the task the jury faced, the relative speed of the verdict indicates that the jury may not have given the evidence the due deliberation that justice required.

More importantly, as set forth above, the Court finds that the nature, quantity, and character of the evidence as to Counts 1, 2, and 4-8 is such that the Court is left with significant concerns that

a miscarriage of justice may likely have occurred. The Government relied exclusively on circumstantial evidence to attempt to prove that Knight had the requisite *mens rea* for the crimes charged. While the Government may prove a guilty mind circumstantially, "the use of circumstantial evidence does not relieve the government of its burden of establishing elements of an offense beyond a mere likelihood or probability, or by more than mere speculation." *United States v. Beckner*, 134 F.3d 714, 719 (5th Cir. 1998) (quotation omitted) (finding that, absent proof that defendant attorney had knowledge of his client's criminal activities, the defendant attorney "did nothing more than discharge properly his duties as an attorney, even if his legal services may have unwittingly assisted [the client] in his misconduct"). The Court finds that, despite the abstract sufficiency of the evidence, the circumstantial evidence in this case as to Counts 1, 2, and 4-8 was not so convincing as to dispel the Court's fears that a miscarriage of justice may have occurred. Rather, the Government's evidence largely invited only speculation and conjecture. The jury was left to consider Knight's criminal intent with little more than his status as Barber's lawyer. "Attorneys are not outside the normal reach of the criminal law . . . That said, lawyers at the least are due its protection." *Beckner*, 134 F.3d at 721 (internal citation omitted). The weight of the evidence in this case is not in favor of a finding that Knight was a corrupt attorney who was knowingly and intentionally furthering the crimes of his client. While Knight may have exercised poor judgment in allowing Barber to use his trust account as a bank account, the evidence did not convince the Court that Knight must therefore also be guilty of criminal conspiracy, bankruptcy fraud, and money laundering.

Although the Court recognizes that it should exercise its power to grant a motion for a new trial sparingly and with caution, it is far too plausible in this case that the jury rested its guilty

verdicts on Counts 1, 2, and 4-8 on guilt by association.  The facts of this case were complex, the applicable law was technical and confusing, and the presentation of evidence did not serve to clarify either the facts or the law.  The gaps left by the evidence presented were too large to be reasonably filled by inference without leaving some doubt as to the correctness of the verdict.  The Court finds that the verdicts of guilty as to Counts 1, 2, and 4-8 are tainted by legitimate concerns as to whether justice was properly served.  In the interests of justice, the Court will therefore set aside the guilty verdicts as to Counts 1, 2, and 4-8 and grant Knight's motion for a new trial as to those Counts.  The issues raised by those counts will be submitted for determination by another jury.

As set forth above, the Court further finds that the evidence presented at trial was insufficient to sustain a guilty verdict on Count 3.

IT IS THEREFORE ORDERED that Defendant's motion for judgment of acquittal is GRANTED IN PART and DENIED IN PART, and Defendant's alternative motion for a new trial is GRANTED as follows:

- The Defendant's motion for judgment of acquittal is GRANTED as to COUNT 3 of the fourth superseding indictment, and the Court will enter a judgment of acquittal as to that Count.

- The Defendant's motion for judgment of acquittal is DENIED as to COUNTS 1, 2, 4, 5, 6, 7, and 8 of the fourth superseding indictment.

- The Defendant's alternative motion for a new trial is GRANTED as to COUNTS 1, 2, 4, 5, 6, 7, and 8 and CONDITIONALLY GRANTED as to COUNT 3 of the fourth superseding indictment, in the event the judgment of acquittal as to Count 3 is subsequently vacated or reversed.  The Court will reset this case for jury trial as to

Counts 1, 2, 4, 5, 6, 7, and 8.

IT IS FURTHER ORDERED that the Government's motion for preliminary order of forfeiture (Doc. 186) is DENIED without prejudice to the Government refiling a motion in the future should it become appropriate to do so.

**IT IS SO ORDERED** this 10th day of June, 2014.

/s/ P. K. Holmes, III
P.K. HOLMES, III
CHIEF U.S. DISTRICT JUDGE